904 F.2d 874
 134 L.R.R.M. (BNA) 2458, 115 Lab.Cas. P 10,127
 William A. PASCARELLI, Regional Director of the
Twenty-Second Region of the National Labor
Relations Board, for and on Behalf of
the NATIONAL LABOR RELATIONS
BOARD, Appellant,
and
International Ladies Garment Workers Union, AFL-CIO,
Plaintiff/Intervenor,
v.
VIBRA SCREW INC.
 No. 89-5973.
 United States Court of Appeals,
Third Circuit.
 Argued April 26, 1990.
Decided June 7, 1990.
 
 William G. Mascioli, (argued), Richard A. Siegel, Ellen A. Farrell, N.L.R.B., Washington, D.C., for appellant William A. Pascarell.
 Joseph S. Fine, (argued), Reitman, Parsonnet & Duggan, Newark, N.J., for plaintiff/intervenor Intern. Ladies Garment Workers Union, AFL-CIO.
 William A. Teltser, (argued), Harold Friedman, Greenberg, Margolis, Ziegler, Schwartz, Dratch, Fishman, Franzblau & Falkin, Roseland, N.J., for appellee Vibra Screw, Inc.
 Before BECKER and GREENBERG, Circuit Judges and DUMBAULD,* District Judge.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 Under Sec. 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 160(j), the National Labor Relations Board may request interim injunctive relief in federal district court against unfair labor practices pending the Board's own administrative determination as to whether those practices have in fact been committed.[1] In making this request, the Board is not acting in the interest of those employees who have allegedly been the victims of unfair labor practices, but in the public interest. Eisenberg v. Wellington Hall Nursing Home, 651 F.2d 902, 906-07 (3d Cir.1981); Eisenberg v. Hartz Mountain Corporation, 519 F.2d 138, 141-42 (3d Cir.1975); Senate Report No. 105. 80th Cong. 1st Sess. 8, 1 Legislative History of the Labor Management Relations Act, 1947, at 414. The public interest at stake is the "promot[ion of] wholesome and mutually acceptable labor relations and the settlement of labor disputes through collective bargaining between employees and their employer." Hartz Mountain, 519 F.2d at 142.
 
 
 2
 In determining whether interim relief is appropriate under Sec. 10(j), a district court must evaluate whether there is "reasonable cause" to believe that an unfair labor practice has occurred and whether an injunction would be "just and proper." See Kobell v. Suburban Lines, 731 F.2d 1076, 1088-89 (3d Cir.1984). The Board requested a Sec. 10(j) injunction in this case based on its belief that appellee, Vibra Screw, Inc. ("Vibra"), had refused to bargain with the Board certified Union and had harassed and retaliated against certain workers trying to organize that union. Without determining whether there was reasonable cause, the district court denied the Board's Sec. 10(j) request on the ground that an injunction would not be "just and proper." The district court's determination was based on its findings that the bargaining unit could easily reconstruct itself should the Board finally determine that Vibra had committed unfair labor practices, that Vibra's practices had not had a chilling effect on union activity, and that the Board did not act expeditiously enough in trying to secure the injunction. The Board's Regional Director appealed.[2] Because we find that the district court misinterpreted the just and proper standard, we will reverse.
 
 I. BACKGROUND FACTS[3]
 
 3
 Vibra Screw is a family-owned business, located in Totowa, New Jersey, which manufactures equipment for movement and measurement of powder-like materials. On December 13, 1988, Luis Fonseca, a representative of the International Ladies Garment Workers' Union, AFL-CIO, and approximately 35 employees of Vibra, met with Eugene Wahl, Vibra's president, and told Wahl that the Union represented a majority of the employees and wished to be recognized as the employees' collective bargaining representative. On December 16, 1988, the Union filed a petition for an election.
 
 
 4
 On January 4, 1989, the employees selected two fellow employees, Messrs. Moncayo and Santo, to represent them at a pre-election meeting. On January 5, Moncayo and Santo notified as many co-workers as possible about the upcoming meeting. Later that morning, their supervisor, John Herman, told them that because they had not been working enough overtime, they would no longer be allowed to work overtime. Prior to this, employees commonly worked overtime, but always on a voluntary basis. App. 91-92; 111-12; 143; 207-08; 225.
 
 
 5
 On February 2, the Union won the election. On February 10, the Union was certified as the exclusive collective-bargaining agent of the bargaining unit. On February 13, Moncayo, one of the two original union representatives, returned to work after having been on disability leave since January 15 for a work-related foot injury. He was informed by the production manager that he was being transferred from his previous department, Assembly, which was part of the bargaining unit, to the Test Lab, which was not part of the bargaining unit. On February 28, Moncayo was fired, allegedly for repeatedly leaving his work station. Moncayo testified that he was not at his work station at the times complained of because of scheduling problems incident to his transfer (the new department had different hours), or because of doctor's appointments, all of which he had properly accounted for.
 
 
 6
 On March 21, Vibra changed the work hours of all employees without notifying the Union. On March 28, Mr. Bermudez, a spare parts clerk, wore a Union badge and hat to work in support of the negotiators, despite his supervisor's previous warning that he should keep his Union support to himself. On March 31, Bermudez was fired for not "hustling" enough.
 
 
 7
 On March 29, Vibra, four Union officials and five employee members of the bargaining committee, Messrs. Drol, Bocanegra, Rodriguez, Santo and Grinyard, met for their first bargaining session. By April 19, Drol, Bocanegra, Rodriguez and Santo had all been fired. Drol and Bocanegra were fired for refusing to work overtime (the bargaining committee members had decided to refuse to work overtime as a means of protesting the Moncayo and Bermudez discharges) even though there was no policy requiring employees to work overtime. Rodriguez and Santo were fired, for "poor work habits" and "standing idle during work time." App. 358, 359. These last two discharges brought the total number of active union members fired to six in less than two months.
 
 
 8
 A negotiating session was scheduled for April 12, but was canceled by Vibra because of Wahl's travel plans. Nonetheless, on that day, the Union submitted extensive proposals for an initial collective bargaining agreement. Vibra tried to reschedule the meeting for the week of May 8, but the Union did not respond until May 17. When it did, it requested that Vibra produce certain outstanding documentation. A new negotiating session was scheduled for June 29.
 
 
 9
 On June 29, the four discharged members of the committee appeared at the scheduled negotiating session. However, the Company refused to participate in a meeting in which those four employees were present, despite being advised by the Union's attorney that, under the law, the Union could designate whomever it wanted to serve as negotiators.
 
 
 10
 On August 16, 1989, William Pascarell, the Board's Regional Director, issued an unfair labor practice complaint, alleging that Vibra had violated Sections 8(a)(1), (3) and (5) of the NLRA.[4] On September 15, after receiving Board authorization, the Director filed a petition for injunctive relief in the district court for the District of New Jersey. The requested injunction sought, inter alia, that Vibra reinstate the six discharged employees and that Vibra meet and bargain in good faith. On October 26, 1989, the district court conducted a hearing, using the transcripts and exhibits from the prior administrative hearing that had been held before an Administrative Law Judge between September 18 and September 25, 1989. Shortly thereafter, the district court entered an order, accompanied by a short statement, denying the petition.
 
 II. THE "JUST AND PROPER" STANDARD
 
 11
 The district court did not determine whether there was reasonable cause to believe that an unfair labor practice had been committed in this case because it decided that, whatever the reasonableness of the need, such an injunction would not be just and proper. Although the term "just and proper" has never been defined with precision, see Eisenberg v. Lenape Products, 781 F.2d 999, 1004-05 (3d Cir.1986); Kobell, 731 F.2d at 1089-94; Wellington Hall, 651 F.2d at 906-07; Hartz Mountain, 519 F.2d at 141-43; Gottfried v. Frankel, 818 F.2d 485, 493-96 (6th Cir.1987); Fuchs v. Hood Industries, 590 F.2d 395, 397 (1st Cir.1979), the cases, the statutory history, see S. Report No. 105 80th Cong. 1st Sess., 27, Legislative History of the Labor Management Relations Act, 1947, 91-433, and the NLRA itself, make clear that it is just and proper to issue a Sec. 10(j) injunction when the nature of the alleged unfair labor practices are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation.[5] The theory is that the chilling effect of management retaliation may outlast the curative effects of any remedial action the Board might take including reinstating illegally discharged workers. Ultimate reinstatement may very well not vindicate the public interest "in the integrity of the collective bargaining process." Wellington Hall, 651 F.2d at 907.
 
 
 12
 Because the "just and proper" inquiry must recognize the public interest implicit in protecting the collective bargaining process, the critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired. The district court based its decision not to grant an injunction on its conclusions that the bargaining unit could easily reconstruct itself, that there had been no chilling effect,[6] and that the Board took too long in requesting the injunction. Our standard of review in this situation requires us to decide whether the district court "discuss[ed] and determine[ed] whether the failure to grant injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers." Kobell v. Suburban Van Lines, Inc., 731 F.2d 1076, 1091-92 (3d Cir.1984) (footnote omitted). Any factual findings underlying this determination must be viewed under a clearly erroneous standard and we cannot disturb the district court's decision unless the "undisturbed factual findings do not substantially relate to the conclusion reached." Id. at 1092.
 
 A. The "Small and Intimate" Exception
 
 13
 In Kobell, we recognized that injunctions are not always just and proper. If the alleged retaliation is against an established, "small and intimate" bargaining unit, improper attempts by management to impair the collective bargaining process will have minimal "chilling" effect because the employees will, most likely, be fully aware of their rights under the NLRA. In the event that the Board ultimately determines that management's practices were unfair, the employees will resume their pre-established bargaining procedures. In such situations, the remedial power of the Board, which ensures that workers can safely assert their protected rights, is not in danger and the Board does not need courts to interfere in order to preserve the pre-harassment status quo. Thus, we "carve[d] out an exception from the Wellington Nursing Home rule." Kobell, 731 F.2d at 1093.[7]
 
 
 14
 Kobell involved a successor employer who refused to hire all 38 of the predecessor employer's employees, allegedly as a means of avoiding its obligation to bargain with the union. All 38 employees had been represented by the same union for 14 years. Kobell, 731 F.2d at 1079-82. Because the court found that such a cohesive and established bargaining unit could "swiftly and effectively reconstruct itself," id. at 1093, there was no real concern that the established members of the bargaining unit would be deterred from rejoining the union.
 
 
 15
 This case is readily distinguishable from Kobell. Moreover, the district court's relevant findings, i.e., that this bargaining unit could easily reconstruct itself and that there had been no chilling effect on the employees, are not supported by the underlying facts. This Union had just been certified when the alleged unfair labor practices started at Vibra. There is no indication in the record as to how, absent immediate relief, this Local will be able to swiftly and effectively reconstruct itself because, at this point, there is still no Local to speak of--certainly not one that, like the Local in Kobell, has an established relationship with both the same union and the same employer.
 
 
 16
 The fact that the four discharged members of the bargaining committee showed some degree of solidarity in adversity is not relevant here. The operative "unit" for purposes of the Kobell exception is the entire bargaining unit, not merely the bargaining committee. What is critical is that the non-activist employees, who are the most susceptible to being intimidated by management's unfair labor practices, be part of a unit that can readily reconstitute itself. In this case, there was no "unit" for those chilled employees to be a part of. The only cohesive group was the small bargaining committee, all of whose members were discharged. The chilling effect that Vibra's actions had on collective activity is patent from the nature and extent of the discharges. Any factual finding to the contrary would be clearly erroneous. In sum, Kobell involved a situation in which the bargaining process was so well established that alleged management intimidation tactics were highly unlikely to chill employees from participating in the process that had been a part of their working lives for 14 years. That is the antithesis of the situation here.
 
 
 17
 Vibra relies heavily on our decision in Eisenberg v. Lenape Products, 781 F.2d 999 (3d Cir.1986). In Lenape Products, we upheld a district court's application of the small and intimate exception in a case, like this one, involving a start-up union. In support of our holding that the district court's findings regarding the size and intimacy of the group were not clearly erroneous, we reasoned:
 
 
 18
 More important to our present analysis however, is the fact that there is no evidence in the record to establish that other employees will be discouraged from engaging in concerted activity in the interim. There is no evidence that management was aware of the employees' embryonic efforts to unionize their division, nor does the Board even contend that they were.... Absent such knowledge, it cannot be said that this case is about "employer retaliation [intended to] destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." Hugh H. Wilson Corporation v. NLRB, 414 F.2d 1345, 1347 (3d Cir.1969), cert. denied, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). For this reason the public interest in safeguarding the collective bargaining process, both in its formative stages and subsequently, is not at stake here.
 
 
 19
 Id. at 1005.
 
 
 20
 Again, the case at bar is very different. Although the district court in Lenape Products relied on the "small and intimate" exception in denying the injunction, it is clear from the court's opinion that the critical factor in Lenape Products was the absence of any management awareness of the Union. The Lenape Products employees had engaged in an arguably protected activity (walking out), and certain employees had contacted a union representative, but there had been no management notification, much less union election or Board certification. Thus, management could not have been acting in an attempt to thwart the bargaining process because management was not even aware that there was a bargaining process. Concomitantly, it was highly unlikely that employees would interpret management's action as retaliation against union activity because the management was unaware of union activity and hence could not have been retaliating.
 
 
 21
 In contradistinction, this case involves a situation in which the union had recently been certified, management had demonstrated anti-union bias, and, most importantly, management had fired the few employees who had been the most open in their support for the union. The message this management action sent was clear--if one is associated with the union, one will be disciplined. Not only is that precisely the kind of message, and action, that the NLRA prohibits, it is the kind of message that cannot be effectively retracted even if the discharged employees are ultimately reinstated by the Board. Employees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity. The Kobell exception is inapplicable in this case.
 
 B. Board Delay
 
 22
 In discussing the Board's delay, the district court explained:
 
 
 23
 Because of what I perceive to be a leisurely pace, any argument that I should order a return to the status quo which existed prior to the alleged violations of months ago, misunderstands, I suggest, the purpose of the 10(j) injunction, which is to permit the effective exercise of the board's remedial authority which could be dissipated by the passage of time.
 
 
 24
 Although the district court did not explicitly state that it was making a finding of fact regarding the time the Board took, it noted that the Board's Sec. 10(j) petition was not filed until eight months after the filing of the first unfair labor practice charge and five to seven months after the discharge of the employees. To the extent that these observations are findings of fact, they are certainly not erroneous. However, as the district court itself noted, the Board's petition was filed only two months after the last unfair labor charge (refusal to bargain) was filed. More importantly, the district court apparently failed to recognize that the gravamen of the Board's complaint, and the reason that the Board was able responsibly to determine that an injunction was necessary, was that Vibra had engaged in a pattern of activity.
 
 
 25
 The pattern could not have been established after the first charge was filed, and could not have been evaluated realistically, as a pattern, until a substantial number of the bargaining committee employees had been discharged. This did not happen until April 19, 1989. Thus, the Board's "delay" can, at most, be calculated at just under six months. To the extent the district court based its decision on its conclusion that six months constituted an (unacceptably) "leisurely pace," that conclusion does not withstand scrutiny.
 
 
 26
 A district court's evaluation of the amount of time that the Board is allowed to take is not a purely factual question. Although the amount of time that may elapse before the Board's action can be considered unreasonable is, to a large extent, case-specific, there is a certain leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme. See Kobell, 731 F.2d at 1078; Wellington Hall, 651 F.2d at 905-06; Maram v. Universidad Interamericana, 722 F.2d 953, 960 (1st Cir.1983).
 
 
 27
 We recognize that this is not the first time that this court has been frustrated by the Board's sometimes astoundingly slow pace,[8] but as the First Circuit has noted, "[t]he very fact that [the Board] must exercise discretion, and that its decision is entitled to presumptive weight ... indicate that it should have time to investigate and deliberate." Maram, 722 F.2d at 960. (holding that a four month delay is not unreasonable). The Board needs time to do a thorough investigation before it even requests the injunction. To require the Board to sacrifice thorough evaluation for speed would dissipate the Board's expertise, and dilute the statutory deference principle.
 
 
 28
 Obviously, undue delay reduces the Board's credibility in arguing that an injunction is absolutely necessary, but given the on-going, cumulative nature of the allegedly unfair labor practices in this particular case, and the time necessary for careful deliberation, we conclude that six months is simply not too long.
 
 III. REASONABLE CAUSE
 
 29
 In order to obtain a Sec. 10(j) injunction, the Board must also establish that it had reasonable cause to believe that the NLRA was violated. Although the ultimate question to be decided is whether the employer intended to thwart the bargaining process, we held in Wellington Hall, that "[i]n a section 10(j) or 10(l ) case the court need not, indeed should not, make a finding of employer motivation. It need only find a reasonable cause for belief that there was such a motivation." 651 F.2d at 906. This holding has been refined into a two pronged standard. First, there must be a substantial, non-frivolous, legal theory, implicit or explicit, in the Board's argument, and second, taking the facts favorably to the Board, there must be sufficient evidence to support that theory. Kobell, 731 F.2d at 1084.
 
 
 30
 Section 7 of the NLRA guarantees employees the "right ... to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. Sec. 157 (1982). Section 8(a) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [that right]," id. Sec. 158(a)(1), to "discriminat[e] in regard to hire or tenure ... or any term or condition of employment, id. Sec. 158(a)(3), and "to refuse to bargain collectively with the representatives of his employees," id. Sec. 158(a)(5).
 
 
 31
 Although the district court refrained from addressing the reasonable cause issue because of its just and proper holding, we will not remand for it to do so because the issue is exceedingly simple. Indeed, given the deference that is due the Board on the facts, see Kobell, 731 F.2d at 1084, there can be no question, on this record, that there was reasonable cause for the Board's request. The Board based its petition on the express statutory prohibitions, quoted above, which clearly constitute a substantial legal theory. Moreover, the facts as alleged substantially support the Board's theory that Vibra was interfering with employees' right to organize, discriminating against those who did organize, and refusing to bargain collectively. Thus, we hold that there was reasonable cause for the Board to believe that Vibra violated the NLRA.[9]
 
 IV.
 
 32
 In light of the foregoing, we will reverse the district court's denial of the injunction and remand with the direction to enter an order granting an injunction pursuant to 29 U.S.C. Sec. 160(j). The mandate shall issue forthwith.
 
 
 
 *
 Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 29 U.S.C. Sec. 160(j) provides in relevant part as follows:
 "[u]pon the filing of any such petition [for temporary relief] the court shall ... have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."
 
 
 [2]
 We have jurisdiction pursuant to 28 U.S.C. Secs. 1291 and 1292(a)(1)
 
 
 [3]
 To the extent the parties present conflicting factual allegations, we must, at this preliminary stage, interpret the conflict in the light most favorable to the Board. Eisenberg v. Lenape Products, 781 F.2d 999, 1003 (3d Cir.1986); Kobell, 731 F.2d 1076, 1084
 
 
 [4]
 Section 8(a) of the NLRA makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of [their right to engage in, or refuse to engage in, concerted labor activity]," 29 U.S.C. Sec. 158(a)(1) (1982), to "discriminat[e] in regard to hire or tenure ... or any term or condition of employment," 29 U.S.C. Sec. 158(a)(3), and "to refuse to bargain collectively with the representatives of his employees," 29 U.S.C. Sec. 158(a)(5)
 
 
 [5]
 We think it important to emphasize that the relevant status quo is not the situation as it was before the Board filed its petition, but the situation as it was right before the alleged unfair labor practices took place. Thus, in this case, it would be the situation as it was after the union had been certified, but before any of the employees had been discharged
 
 
 [6]
 The district court made these two conclusions, that the unit could easily reconstruct itself and that there was no chilling effect, separately. However, the determinations are related. As we explain, infra, the chilling effect finding is a preliminary determination that must be made in order to determine whether the bargaining unit will be able to easily reconstruct itself. If there is a chilling effect, a bargaining unit would not be able to reconstruct itself easily; if there is not a chilling effect, potential reconstruction will probably be easier
 
 
 [7]
 In retrospect, we question whether Wellington Hall established a "rule," or, as the Board characterizes it, a "presumption," so much as it refined the factors that the district court must consider in determining the public interest at stake in the just and proper inquiry. See Wellington Hall, 651 F.2d at 906-07, Hartz Mountain, 519 F.2d at 141. "When the Board, faced with an employer's resort to tactics calculated to undermine union support at a critical stage of the bargaining process, seeks section 10(j) relief, the focus of attention should not be on what relief may ultimately be granted to individual employees, but on the likelihood of harm to the bargaining process in the interim." Wellington Hall, 651 F.2d at 907 (footnote omitted). The "presumptive" quality to this inquiry stems from the deference due the Board when it requests a Sec. 10(j) injunction. Id. at 906. Unless there are circumstances, like the size, intimacy and longevity of the bargaining unit, which indicate that the bargaining process will not be harmed, courts must be deferential to the Board's determination that the integrity of the process needs interim protection
 
 
 [8]
 See Kobell, 731 F.2d at 1091, n. 27; Wellington Hall, 651 F.2d 902, 907 (3d Cir.1981)
 
 
 [9]
 The district court observed that the conduct at issue in this case presented the "not unusual start-up problems experienced as a result of a new and unfamiliar situation." With respect, firing all but one member of the negotiating committee, firing two of the other more active members of the embryonic union, and refusing to bargain with representatives with whom it was legally required to do so cannot be said to reflect the usual start-up problems associated with unionization
 We recognize that there is some indication in this record that various acts of vandalism, including potential arson and defilement of restrooms, may have been intended as acts of anti-management harassment. If these acts were so intended, the behavior is reprehensible, but they do not give Vibra the right to violate the NLRA.