**Earl L. LEDFORD, Acting Regional Director of Region 9 of the National Labor Relations Board, For and on Behalf of NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MINING SPECIALISTS, INC., and Its Alter Ego, Point Mining, Inc., Respondents.**

Civ. A. No. 2:93–0751.

United States District Court, S.D. West Virginia, at Charleston.

Nov. 23, 1993.

David L. Ness, Cincinnati, OH, for petitioner.

Daniel L. Stickler, Michael R. Whitt, Jackson & Kelly, Charleston, WV, for respondents.

### MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the petition of Earl L. Ledford, Acting Regional Director of the ninth region of the National Labor Relations Board, for temporary injunctive relief pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), as amended, pending the final disposition of an unfair labor practice complaint brought by the NLRB against Mining Specialists, Inc., and Point Mining, Inc., and currently pending before the NLRB.

The record before the court consists of the parties' pleadings, evidence adduced at a hearing held on October 15, 1993, and the stipulations set forth in the parties' prehearing memorandum, entered on October 18, 1993, which stipulations are incorporated herein by reference and accepted by the court as part of its findings. In addition, the parties have submitted memoranda of law.

#### I. Background

For convenience, the background leading up to the filing of the unfair labor practices complaint against Mining Specialists and Point Mining is briefly summarized and, except where noted, is undisputed.

Mining Specialists was incorporated by James Roy Lucas, its president and sole owner, on March 24, 1988. As an independent contractor, Mining Specialists conducted mining operations at Hunt Hollow on Witcher Creek under a contract with Catenary Coal Company from early 1988 until January 29, 1993, when the minable coal reserves were depleted and Mining Specialists ceased operations. During the time it was in operation, Mining Specialists was a signatory to the National Bituminous Coal Wage Agree-

ment of 1988. Mining Specialists accordingly utilized a unionized labor force represented by the United Mine Workers of America, with the terms and conditions of employment being governed by the Wage Agreement. On February 1, 1993, the Wage Agreement expired by its terms. Mining Specialists has not operated since the end of January 1993. Lucas testified that the Mining Specialists' mine was permanently closed and sealed on April 30, 1993 and that Mining Specialists is closed down. (Tr. at 21.)

Point Mining was incorporated by James Roy Lucas on February 10, 1992. Lucas is the president and sole owner of Point Mining. Betty Lucas, the wife of James Roy Lucas and the secretary/treasurer of Mining Specialists, is also the secretary/treasurer of Point Mining. On February 6, 1993, approximately one week after Mining Specialists ceased operations under its contract with Catenary Coal, Point Mining commenced limited coal mining activities as a contract miner for Valley Coal Company, d/b/a Red River Valley Coal Company, (hereinafter, Valley Coal), at a mine located on Campbell's Creek. Although the Mining Specialists and Point Mining mines are twenty-five to thirty miles apart by highway travel, they are only a few air miles from each other and are connected by a haul road approximately three and one-half miles long. Full scale mining by Point Mining started on about March 29, 1993.

Although the exact relationship between the entities having the right to mine the coal on the tracts worked by Mining Specialists and Point Mining is not known, counsel for respondents stipulated that there is a corporate relationship between Catenary Coal and Valley Coal. In addition, Lucas testified that Catenary Coal solicited the bid that he ultimately submitted on behalf of Point Mining for the work to be performed for Valley Coal. He also testified that under an oral agreement with Catenary, he uses certain Catenary equipment at Point Mining's mine.

On January 26, 1993, the week that Mining Specialists ceased operations, Lucas held a meeting with the Mining Specialists' employees. During the meeting, Lucas advised the employees that Mining Specialists was closing and that new work would commence at Campbell's Creek on a union-free basis. (Tr. at 30, 37–38.) The wages and benefits to be offered at the Campbell's Creek operation were described to the employees and they were asked to sign their names to a piece of paper if they wished to be considered for employment at the new location. Lucas' son, Rodney David Lucas, who was also present at the meeting, told the employees that all of them would be without a job if the Campbell's Creek mine became unionized. (Tr. at 40.) In testifying at the hearing held on October 15, 1993, Lucas explained that in order for Point Mining to be a competitive bidder on the contract with Valley Coal, it was necessary to bid on a union-free basis. (Tr. at 40.)

Subsequently, fourteen of the fifteen hourly workers employed by Mining Specialists before it ceased operations went to work for Point Mining, which operates union free. The workers are paid a higher hourly wage than required by the Wage Agreement in effect for Mining Specialists' employees. However, health insurance benefits are not as generous, pension contributions are different, time off with pay and overtime pay is not as liberal and there is no grievance/arbitration process in effect. In late April or early May, Point Mining told employees that it was in the process of compiling a booklet that would describe the terms and conditions of their employment.

In addition to employing all but one of the same hourly wage work force, Point Mining utilizes basically the same supervisory staff as that used by Mining Specialists. Except to the extent that Point Mining's operations require the use of different equipment, Mining Specialists' equipment is in use by Point Mining. Financial records maintained by the respondents show that Point Mining's State of West Virginia Department of Labor wage bond was paid from the account of Mining Specialists and that some wages to Point Mining employees were paid from Mining Specialists' account during the first few weeks that Point Mining conducted business.

On April 7, 1993, shortly after Point Mining began full-time operations, UMWA District 17, wrote to Lucas seeking, *inter alia,* a list of the names, addresses and phone num-

bers of the employees of Mining Specialists and Point Mining and a copy of the health and life insurance policies in effect for those employees. When the information was not provided, the union filed an unfair labor practice charge with the NLRB. After investigating the charge, general counsel for the NLRB issued a complaint against the respondents on June 22, 1993, alleging that Point Mining is the alter ego of Mining Specialists and that both companies have engaged in activities which violate the National Labor Relations Act. Thereafter, on August 20, 1993, this petition for temporary injunctive relief was filed.

In the interim, on July 22, 1993, Mining Specialists mailed a letter to the union notifying it of Mining Specialist' termination of the Wage Agreement of 1988, which pursuant to the sixty-day notice requirement of Article XXIX, became effective on or about September 22, 1993.[1] The union denies receipt of the July 22, 1993, letter of termination, but acknowledges receiving a second letter, dated August 26, 1993, making reference to it.

Petitioner alleges that the respondents violated section 8(a)(1) of the Act[2] by threatening employees with discharge and mine closure if they engaged in union activities while working for Point Mining. The petition also alleges that respondents violated section 8(a)(5)[3] by withdrawing recognition of the union when Point Mining started operations; by dealing directly with employees on the issues of wages and benefits and by informing them that an employee booklet would be distributed to them; by failing to continue in effect the terms and conditions of the Wage Agreement; and by failing to comply with the union's request for the names and addresses of Point Mining's employees and for information concerning their health and life insurance carriers and benefits.

## II. Discussion

Under section 10(j) of the National Labor Relations Act, district courts, on petition of the NLRB, have discretion to grant injunctive relief in unfair labor practice cases pending before the Board.[4] Employing a two-step analysis, injunctive relief is appropriate if the Regional Director of the NLRB has "reasonable cause" to believe that the defendants violated the Act and the relief sought would be "just and proper." *D'Amico v. Cox Creek Refining Co.*, 719 F.Supp. 403, 406–07 (D.Md.1989); *D'Amico v. A.G. Boone Co.*, 647 F.Supp. 1546, 1549 (W.D.Va.1986).

### A. Reasonable Cause

Reasonable cause exists if "there is some reasonable possibility that the Board will ultimately enter an enforceable order." *Humphrey ex rel. NLRB v. International Longshoremen's Ass'n AFL–CIO*, 548 F.2d 494, 498 (4th Cir.1977). Accordingly, it is neither necessary nor proper for the court to decide the unfair labor practice charge on the merits. Id. at 497. In deciding whether the evidence could reasonably support a finding that an unfair labor practice has been committed, the evidence is to be viewed in the light most favorable to the Board, *Cox Creek*, 719 F.Supp. at 407 (citing *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37 (2d Cir.1975)). Indeed, "General Counsel's resolution of disputed issues of law and fact should be accorded considerable deference." *Humphrey,*

---

1. Article XXIX provides that the Agreement may not be terminated by any signatory party prior to 11:59 p.m., February 1, 1993. After that time, it may be terminated "by giving at least sixty days written notice to the other party of such desired termination date."

2. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" the organizational rights protected by section 7 of the Act.

3. Under section 8(a)(5), it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."

4. Section 10(j) provides in relevant part:

> The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

548 F.2d at 498. Nonetheless, the court must undertake its own independent review, *Cox Creek,* 719 F.Supp. at 407, keeping in mind that where the Board's expertise may be particularly helpful in a case presenting "a difficult question as to the proper application of a legal standard to a complex industrial situation, the district court ... should be especially reluctant to conclude that the [Board's] contentions are without merit." *Humphrey,* 548 F.2d at 498.

In undertaking its own review, the court first looks to the substantive law which governs the Board's ultimate resolution of the unfair labor practice charge. The underlying complaint in this action rests on the premise that Point Mining is the alter ego of Mining Specialists. If alter ego status is imposed, Mining Specialists' labor obligations are carried over to Point Mining and both may be held liable for any violation of those duties by either of them. *Alkire v. NLRB,* 716 F.2d 1014, 1018 (4th Cir.1983).

In general, the alter ego doctrine operates "to treat two nominally separate business entities as if they were a single continuous employer." *Id.* In ascertaining whether the doctrine applies, it is necessary to examine "the circumstances under which the transfer of business operations was conducted, in order to determine whether the change resulted in a *'bona fide* discontinuance and a true change of ownership,' or merely a 'disguised continuance of the old employer.'" *Id.* (quoting *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942)). Each case "turn[s] on its own facts," with the NLRB usually finding that alter ego status exists where two entities have "'substantially identical' management, business purposes, operation, equipment, customers, and supervision, as well as ownership." *Id.* at 1018 n. 4.

The facts of this case show that Lucas is the sole owner and president of both Mining Specialists and Point Mining and his wife serves as secretary/treasurer of both. Point Mining engages in contract mining operations, as did Mining Specialists. There is a corporate relationship between Catenary Coal and Valley Coal. The contract under which Point Mining performs was solicited by Catenary, the company with which Mining Specialists contracted. All of Mining Specialists' supervisory work force is employed by Point Mining and fourteen of the fifteen hourly workers employed by Mining Specialists were later hired by Point Mining. To the extent possible, Point Mining is using the same equipment that was used by Mining Specialists. In addition, some financial obligations of Point Mining were paid by Mining Specialists. Thus, there is ample evidence to support a Board finding that Mining Specialists and Point Mining are substantially identical entities.

Nonetheless, under the controlling law of the Fourth Circuit Court of Appeals, a finding of common control and substantial identity of operations is only the first step in determining whether alter ego status should be imposed. *Alkire,* 716 F.2d at 1020; *see also NLRB v. McAllister Bros., Inc.,* 819 F.2d 439, 444 (4th Cir.1987). The second step of the inquiry focuses on "whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations." *Alkire,* 716 F.2d at 1020; *see also McAllister,* 819 F.2d at 444. It is not necessary to show an actual intent to evade the labor laws, although such a showing will usually satisfy the second prong of the inquiry. *McAllister,* 819 F.2d at 445 n. 14. Rather, as the Fourth Circuit Court of Appeals explained in *Alkire:*

> [T]he employer may intend no evasiveness or subterfuge, but merely seek[ ] what it believes is a legitimate benefit offered by a strategic business reorganization.
>
> Nevertheless, the effect is the same in both situations: the employer obtains an economic benefit at the expense of statutory employee rights, upsetting and undermining the balance of power between labor and management created to reflect national labor policy. By eliminating the benefit derived from transferring operations to a separate entity, the *alter ego* doctrine redresses this economic imbalance. If the employer obtains no benefit from the transfer, however, and none was reasonably foreseeable, nothing in labor policy

justifies preventing it from arranging its affairs as it sees fit.

*Alkire,* 716 F.2d at 1020–21.

There can be no doubt, based on the testimony of Lucas and the statement made by his son at the January 26, 1993, meeting with Mining Specialists' unionized labor force, that Lucas was motivated to reorganize his business affairs in a manner that would permit union-free operations. It is maintained, however, that no benefit was gained by transferring operations from Mining Specialists to Point Mining.

In the view of the respondents, the 1988 Wage Agreement does not prohibit employers from establishing new operations which are not subject to the terms of the Agreement. Instead, they maintain, the Agreement requires only that sixty percent (60%) of the employees at the new operation be chosen from the panel of laid off workers of the signatory company. Thus, respondents argue, Mining Specialists could open a new mine and satisfy its labor obligations by simply hiring sixty percent of its former employees to work at the new operations, an obligation which was satisfied when Point Mining hired fourteen of the fifteen workers employed by Mining Specialists when it ceased mining activities. Moreover, according to the respondents, the employees at the new operations would not be covered by the 1988 Wage Agreement unless and until the union gained recognition as their bargaining agent at the new location. In sum, respondents maintain that even if Point Mining is substantially identical to Mining Specialist, it has fulfilled all of the duties imposed by the Wage Agreement and accordingly no benefit was derived from the corporate reorganization.

In support of their position, the respondents reference two portions of the 1988 Wage Agreement. Article IA, which pertains to the scope and coverage of the Agreement, provides for "Application of This Contract to the Employer's Coal Lands" as follows:

As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal prepa-ration facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. This section will immediately apply to any new operations upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights. Notwithstanding the foregoing, the terms of this Agreement shall be applied without evidence of Union representation of the Employees involved to any relocation of an operation already covered by the terms of this Agreement.

(Pet'r Ex. 1 at Art. IA(f), p. 6.)

Article IIA, governing Job Opportunity and Benefit Security (JOBS), with an exception not pertinent here, contains the following provision with respect to non-signatory operations:

1. [T]he first three out of every five new job openings for work of a nature covered by this Agreement at any existing, *new,* or newly acquired non-signatory bituminous coal operation of the Employer shall be filled by classified laid-off Employees on the panels of the Employer's operations covered by this Agreement.

(*Id.* at Art. IIA.1., p. 10) (emphasis added). The provision is subject to the caveat that "[n]othing in the JOBS Program shall be construed to diminish any rights of the Employees or the Union established in any other provision of this Agreement...." (*Id.* at p. 10.)

The petitioner's interpretation of the Agreement and its application to the facts presented here differs from that of the respondents. In his view, there is no new operation but only a relocation of an existing operation. Thus, he maintains, Article IIA.1. does not apply. Instead, Article IA(f) controls and requires continuing application of the Wage Agreement to Point Mining's operation because, as the alter ego of Mining Specialists, Point Mining's operation is merely a relocation of the operation engaged in by Mining Specialists.

Mindful that it is not appropriate at this stage to finally resolve the merits of the petitioner's unfair labor practice charge, the court finds it unnecessary to determine which interpretation of the Wage Agreement is correct. Recognizing that the Board's expertise may be particularly helpful in interpreting the Wage Agreement in conjunction with the rights protected by the National Labor Relations Act and according the Regional Director's view of the issues in dispute here the deference due, the court concludes that there is a reasonable possibility that the Board will ultimately enter an enforceable order finding that the respondents have committed an unfair labor practice under the alter ego doctrine by reorganizing their corporate structure to obtain an economic benefit at the expense of the employees' statutory rights.[5]

### B. *Just and Proper*

Having concluded that petitioner has reasonable cause to believe that an unfair labor practice has been committed, the court turns to the question of whether the relief sought is "just and proper" under the circumstances.

By way of relief, petitioner seeks an order enjoining and restraining the respondents from (1) threatening employees that the Point Mining operations will close or that the employees will be discharged if they engage in union organization efforts; (2) withdrawing recognition from the union and refusing to bargain with it in good faith; (3) bypassing the union and dealing directly with employees regarding the terms and conditions of their employment; (4) refusing to comply with the terms and conditions of employment set forth in the Wage Agreement of 1988 unless and until the parties lawfully terminate that agreement; (5) refusing to provide the union with requested information necessary to its duties as the exclusive collec-

tive bargaining representative of the respondents' employees; (6) forming any business enterprise for the purpose of attempting to avoid their statutory and contractual obligations to the union and to their employees; and (7) otherwise violating section 7 of the National Labor Relations Act.

Correspondingly, petitioner seeks an affirmative order directing the respondents to (1) recognize and bargain with the union in good faith; (2) comply with the terms of the Wage Agreement of 1988 until it is terminated or the parties have bargained to impasse; (3) provide the union with the information requested; (4) post copies of the court's opinion and order at the Campbell's Creek mine location of Point Mining; and (5) provide petitioner with a sworn affidavit stating the manner in which they have complied with the court's order.

In the view of the petitioner, the failure to grant injunctive relief will cause irreparable harm to the non-economic interests of Point Mining's employees and will allow the respondents to avoid the non-economic obligations of the Wage Agreement.[6] It is also asserted that absent an interim bargaining order, the potential benefits of a timely negotiated successor contract will be postponed. Petitioner maintains, in addition, that depriving the employees of the non-economic benefits of the collective bargaining agreement and permitting modifications of the collective bargaining agreement without the union's consent will irreversibly undermine the employees' support for the union as demonstrated by the employees' abandonment of the union when given a choice between the loss of their jobs and working for Point Mining union free.

Petitioner further claims that there is a "clear and present danger" that respondents will create other alter ego entities to evade their statutory duties if the current mining

---

**5.** The court's conclusion is based on how it would be inclined to interpret the language of the Wage Agreement were it called on to do so. Assuming, as the parties have, that Article IA(f) applies to employers performing contract mining operations, had Mining Specialist rather than Point Mining contracted with Valley Coal for the work at Campbell's Creek, it would be a reasonable interpretation of that provision to consider the change in work to be performed a "reloca-

tion" rather than a "new" operation. Accordingly, Mining Specialist would continue to be subject to the Wage Agreement under Article IA(f).

**6.** The only non-economic interest identified by petitioner is the grievance/arbitration process provided for in the Wage Agreement.

contract with Valley Coal is canceled or lost and, thus, they should be restrained from doing so. Finally, petitioner claims that a posting of a court order granting the relief requested is necessary to reassure the employees that their statutory rights are being protected.

Respondents counter that the granting of injunctive relief would frustrate the purpose of the National Labor Relations Act by requiring them to implement the 1988 Wage Agreement with respect to employees not yet organized by the union. They also assert that inasmuch as Mining Specialists terminated the 1988 Wage Agreement effective September 22, 1993, an order directing compliance with its terms would be moot.

The standard to be applied in determining whether the relief sought under section 10(j) is "just and proper" is not well defined in decisions by the Fourth Circuit Court of Appeals. However, the primary consideration, as set out in *NLRB v. Aerovox Corp. of Myrtle Beach, S.C.,*[7] 389 F.2d 475 (4th Cir. 1967), is whether the facts or circumstances demonstrate that "the remedial purposes of the Act will be frustrated unless relief *pendente lite* is granted." *Id.* at 477. The court explained: "Administration of the Act is vested by Congress in the Board, and when the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless, temporary relief may be granted under section 10(j)." *Id.* (quoting *Angle v. Sacks,* 382 F.2d 655, 660 (10th Cir.1967)).

■■■■ Other courts similarly hold that injunctive relief under section 10(j) is an extraordinary remedy which is just and prop-

er only on a showing that failure to grant the relief would dissipate the effective exercise of the Board's remedial power and render meaningless any final order it issued.[8] *E.g., Arlook v. S. Lichtenberg & Co.,* 952 F.2d 367, 372, 374 (11th Cir.1992) (citing *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1192 (5th Cir.1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976)); *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 80,* 927 F.2d 926, 927 (6th Cir. 1991); *Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1091 & n. 26 (3rd Cir.1984). In other words, the court should consider "whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers."[9] *Kobell,* 731 F.2d at 1091–92 (footnote omitted). Nevertheless, "'the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.'" *Gottfried,* 927 F.2d at 928 (quoting *Gottfried v. Frankel,* 818 F.2d 485, 494 (6th Cir.1987)); *Kobell,* 731 F.2d at 1091. Stated differently, relief under section 10(j) "is proper not to remedy unfair labor practices but merely to preserve conditions in a particular case so that any remedy the NLRB might choose will have a chance to be effective." *Clark v. International Union, UMWA,* 722 F.Supp. 250, 253 (W.D.Va.1989).

■■■■ Once the necessary showing is made that injunctive relief is appropriate, preservation and restoration of the status quo may then be proper pending completion of the Board's normal procedures. *Gottfried,* 927 F.2d at 928; *Aerovox,* 389 F.2d at 477.

---

7. *Aerovox* was before the court pursuant to § 10(e), which authorizes the court of appeals to grant "such temporary relief or restraining order as it deems just and proper" during the pendency of enforcement proceedings brought before it. *Aerovox,* 389 F.2d at 476; 29 U.S.C. § 10(e). The court noted, however, in relying on case law arising under § 10(e), that the standards for temporary relief are the same under both sections.

8. The failure to show that effective enforcement of the Board's action is threatened in the absence of an injunction is akin to a failure to establish

irreparable injury under the traditional test used in injunction cases filed by public officials. *See Kinney v. Pioneer Press,* 881 F.2d 485, 494 (7th Cir.1989).

9. The court in *Kobell* cautioned that § 10(j) should not become the usual method for resolving labor disputes and suggested that injunctive relief is appropriate only in the "extraordinary" case where there is the *"unusual* likelihood (compared to other cases before the Board) of ultimate remedial failure." *Kobell,* 731 F.2d at 1091–92 & n. 26 (emphasis in original).

When it is appropriate to preserve or restore the status quo, the relevant status quo is the situation which existed just before the alleged unfair labor practice occurred. *Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 878 n. 5 (3rd Cir.1990).

■ In assessing whether the Board's remedial powers would be frustrated and its final order rendered meaningless without injunctive relief, courts consider whether union strength or organizational efforts are being eroded or extinguished as a result of an unfair labor practice arising out of a refusal to bargain. *Aerovox*, 389 F.2d at 477; *Arlook*, 952 F.2d at 372. In that respect, it is observed that unions which are newly certified and bargaining for their first contract are particularly vulnerable to employer misconduct. *Arlook*, 952 F.2d at 372; *Pascarell*, 904 F.2d at 880; *see International Union, UAA & A Implement Workers of Am. v. NLRB*, 449 F.2d 1046, 1052 (D.C.Cir.1971). A work environment that engenders fear that participating in union activities will cause a loss of one's job can reasonably be expected to weaken support for a newly organized union and make it likely that the Board can never restore the status quo that existed prior to the labor violation. *Arlook*, 952 F.2d at 372.

On the other hand, a "cohesive and established" bargaining unit is less susceptible to management's attempts to impair the collective bargaining process "because the employees will, most likely, be fully aware of their rights under the NLRA." *Pascarell*, 904 F.2d at 879. Under those circumstances, the employees can be expected to promptly and effectively resume their former collective bargaining procedures if the Board ultimately determines that the employer's practices were unfair labor practices, *Id.* "In such situations, the remedial power of the Board, which ensures that workers can safely assert their protected rights, is not in danger and the Board does not need courts to interfere in order to preserve the pre-harassment status quo." *Id.*

■ Other pertinent factors are whether bargaining pendente lite will lead to or expedite an ultimate agreement between management and labor, *International Union*, 449 F.2d at 1052; whether "violations reasonably found to have been committed will be repeated absent an injunction," *Arlook*, 952 F.2d at 372; whether achieving status quo is possible, *Gottfried v. Frankel*, 818 F.2d at 495; and whether an unlawful objective could be accomplished before the Board has time to act, *Kobell*, 731 F.2d at 1091–92 & n. 25.

The National Bituminous Coal Wage Agreement of 1988 was executed on February 1, 1988, by international officers of the United Mine Workers of America and the president of the Bituminous Coal Operators' Association, Inc., (hereinafter, BCOA), the organization of employers designated to conduct collective bargaining negotiations with the UMWA on behalf of multiple coal operators and associations throughout the State of West Virginia and elsewhere. On April 26, 1988, shortly after Mining Specialists was incorporated, Lucas, as president of Mining Specialists, signed the 1988 Wage Agreement.

Mining Specialists mined only at Hunt Hollow. Throughout its operations, all of its hourly workers were represented by the UMWA. There were fifteen unionized employees working at the mine when it closed. Fourteen of those same employees have since been employed by Point Mining. Russell Shearer testified that he worked for Mining Specialists from August 1991 until it closed. Dan Taylor stated that he first started working for Mining Specialists on October 31, 1989, and worked for it until the mine closed. Both subsequently went to work for Point Mining as non-union employees.

From those facts it is seen that the unit of employees affected by the violations alleged here is small in number and has a history of being represented by the UMWA, a well established union in the coal mining industry. Accordingly, this is not a situation where there is a newly certified bargaining unit seeking to negotiate its first contract, where employees are particularly vulnerable to violations of rights protected by the National Labor Relations Act. Rather, the employees have demonstrable experience with an employment relationship governed by a collective bargaining agreement. Two of the em-

ployees testified in this case. Clearly, they are aware that petitioner seeks to protect their organizational and bargaining rights by reinstating the terms and conditions of the collective bargaining agreement.

Nor is there concern here that the employees would not receive the benefits of a Board order in favor of petitioner because they have been forced to seek employment elsewhere. They continue to be employed by essentially the same entity. Being experienced members of an established bargaining unit and being fully aware of the rights entitled to protection by national labor policy and of petitioner's actions to protect those rights, they can quickly and effectively return to their former unionized status if the Board ultimately determines that relief is appropriate. Thus, it is unlikely that the Board's remedial power would be rendered meaningless by the failure to grant injunctive relief during the pendency of the proceedings before it. Correspondingly, there is no demonstrated irreparable harm to the public's interest in protecting the integrity of the collective bargaining process.

Likewise, there is no evidence of significant irreparable harm to the employees attributable to a delay in receiving relief from a Board order finding that respondents have violated the Act. They remain employed by Point Mining, receiving higher wages and benefits which do not differ significantly from those provided by Mining Specialists. The loss of the grievance/arbitration process cannot be deemed an irreparable harm in the absence of any complaints of disciplinary actions or discharge which would be the subject of that process were it in effect.

By comparison, there is a greater possibility of irreparable harm to Point Mining if injunctive relief is granted and it is ultimately determined that no violation occurred. Lucas testified that in order to be competitive, the contract with Valley Coal had to be bid on a nonunion basis. From that statement and his son's statement that they would all be without jobs if Point Mining did not stay union free, it can be inferred that the financial viability of Point Mining would be jeopardized by the imposition of the terms and conditions of the collective bargaining agreement, possibly to the extent that it would be forced to cease operations and lose the contract with Valley Coal. As a further consequence, the employees' jobs would be lost. Should that happen and should there be an ultimate determination that respondents did not commit an unfair labor practice, the harm to the respondents and the employees would be irreparable inasmuch as it would likely not be possible to restore the status quo either as it exists today or as it existed prior to the alleged violations.

Similarly, an injunction requiring respondents to bargain with the union now would not necessarily expedite an ultimate agreement between Point Mining and its employees. As earlier noted, negotiations with the UMWA are conducted by BCOA, not by individual employers. Those negotiations have been ongoing since expiration of the 1988 Wage Agreement. If an order is ultimately entered against the respondents and they continue in existence, it is likely that they will once again become signatories to any new agreement which is reached rather than negotiating separately with the union. Any separately negotiated agreement would doubtless substantially parallel that reached with the UMWA and BCOA.

Consideration of the remaining factors set forth above likewise does not weigh persuasively in favor of injunctive relief. Except for the statements made on January 26, 1993, there is no evidence of ongoing threats that jobs will be lost if Point Mining becomes unionized. Nor is there reason to believe that respondents, faced with the violations charged here, will attempt another corporate reorganization for the purpose of conducting mining operations. Finally, petitioner's suggestion that Point Mining could complete its contract with Valley Coal and accomplish its unlawful objection before proceedings before the Board are concluded is based on mere speculation, there being no evidence that Point Mining is approaching completion of the mining being conducted on Campbell's Creek or that it otherwise plans to cease operations unless it becomes financially infeasible to continue.

In summary, the court concludes that the injunctive relief sought by petitioner is not

just and proper under the circumstances. The relief sought would in effect substitute the power of the court for that of the Board. On the other hand, denying injunctive relief will preserve the present condition so that any remedy ultimately ordered could be effectively carried out. There being no persuasive evidence that union strength will disappear or be eroded during the time it takes for the Board to complete its procedures, the balance of harm tips in favor of the respondents because of the risk of the potentially unnecessary collapse of their business and concomitant loss of jobs pending the decision of the Board, which may ultimately be rendered in respondents' favor.

### III. Conclusion

For the reasons stated, it is **ORDERED** that the Regional Director's petition for temporary injunctive relief under section 10(j) of the National Labor Relations Act be, and the same hereby is, denied. All matters herein having been concluded, it is further **ORDERED** that this action be, and the same hereby is, dismissed and stricken from the docket of the court.