**Francis W. HOEBER, Acting Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**KNZ CONSTRUCTION, INC., Respondent.**

**Civ. A. No. 94–5486.**

United States District Court, E.D. Pennsylvania.

March 1, 1995.

Francis W. Hoeber, Philadelphia, PA, pro se.

Steven Goldstein, N.L.R.B., Philadelphia, PA, for N.L.R.B.

Larry J. Rappoport, Stevens and Lee, Wayne, PA, for KNZ Const., Inc.

## MEMORANDUM AND ORDER

YOHN, District Judge.

Before the court is a petition by Francis W. Hoeber, Acting Regional director of the Fourth Region of the National Labor Relations Board ("Board"), for interim injunctive relief under section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S. § 160(j), pending administrative adjudication by the Board of an unfair labor practices complaint.[1] The Board issued the complaint

---

1. The section states:

The board shall have power, upon issuance

upon charges of unfair labor practices within the meaning of the NLRA filed by local 252 of the Glaziers and Architectural Metal Workers Union, International Brotherhood of Allied Trades, AFL–CIO ("Union"). The respondent is KNZ Construction, Inc. ("KNZ"), a fabricator and installer of commercial aluminum replacement windows. Petitioner seeks a temporary injunction ordering respondent to cease and desist from certain unfair labor practices and to take certain affirmative actions, including reinstating two former employees and bargaining in good faith with the Union under an interim bargaining order. Because this case meets the standards of the Third Circuit for issuing the requested interim relief under section 10(j), the court will grant the petition.

## I. INTRODUCTION

The Union filed the original charge of unfair labor practices against KNZ in the first of two cases on March 9, 1994 and in the second on May 20, 1994. On June 30, 1994, it filed an amended charge in the first case, and the same day the Board consolidated the two cases, and issued a complaint and notice of hearing. KNZ filed an answer on July 15, 1994. The Board issued amendments to the consolidated complaint on July 19, and KNZ filed an answer to the amendments on July 26, 1994. An administrative law judge held a hearing on September 26–29, 1994, and issued his decision and recommendation order on February 13, 1995, granting the relief the Board requested.[2] The transcript and exhibits of the hearing before the administrative law judge comprise the record in this case.[3]

The NLRA contemplated that at times there would be dual proceedings, as in this case, before the Board, in the form of a hearing before an administrative law judge, and before the district court, in the form of a petition by the Board for interim injunctive relief. The process by which the Board is authorized to hear and determine cases of unfair labor practices under 29 U.S.C. §§ 160(a), (b), and (c) has several steps. After the administrative law judge issues a ruling, the Board must affirm the decision and order. Even then, the Board decision and order are not self-enforcing, and no sanctions attach until the order is enforced after review by the court of appeals under 29 U.S.C. §§ 160(e) and (f). Because such proceedings can be protracted, Congress enacted additional procedures to provide interim injunctive relief and to preserve or restore the status quo pending the final disposition of the charges.

In this Circuit, a district court may grant interim injunctive relief under section 10(j) of the NLRA where it finds "reasonable cause" to believe an unfair labor practice has occurred and determines that the relief sought is "just and proper." *Pascarell v. Vibra Screw, Inc.,* 904 F.2d 874, 877 (3d Cir.1990), *citing Kobell v. Suburban Lines,* 731 F.2d 1076, 1088–89 (3d Cir.1984). Under the first prong of this test, in finding there is reasonable cause to believe an unfair labor practice has occurred, the district court does not find that such a practice has, in fact, occurred. *Kobell,* 731 F.2d at 1083–84; *see also Eisenberg v. Wellington Hall Nursing Home, Inc.,* 651 F.2d 902, 906 (3d Cir.1981); *Eisenberg v. Honeycomb Plastics Corp.,* No. 86–3438 (D.N.J. January 9, 1987) 1987 WL 109093 at *3. That question is left for the proceedings before the administrative law judge, where a different, and higher, stan-

---

of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

2. The administrative law judge issued his decision during the preparation of this memorandum, in which this court, making an independent determination and using a different standard, arrived at essentially the same conclusions.

3. In citing to the record, "Tr." refers to the transcript of the hearing and "GCX" to the General Counsel's Exhibits.

dard of proof applies. Nor does the district court resolve credibility issues raised by the evidence. *Id.* at *3–4. The Board as petitioner has a "relatively insubstantial" burden of proof in the district court proceedings. *Kobell,* 731 F.2d at 1084. It must merely convince the court that there is reasonable support for its position; it need not convince the court that it is likely to prevail on the merits before the administrative law judge and the Board. *Id.* at 1078. The Board as petitioner meets this standard as long as (1) its legal theory is "substantial and not frivolous" and (2) there is sufficient evidence to support the theory, viewing contested factual issues favorably to the petitioner. *Pascarell,* 904 F.2d at 882, citing *Kobell,* 731 F.2d at 1084.

■ The district court's determination that there is reasonable cause to believe something is for purposes of preliminary injunctive relief only and is meant to have no bearing on the administrative determination of the same matters. Similarly, under the second prong of the test, the district court's conclusion that the relief requested under section 10(j) is "just and proper" is also meant to have no bearing on the administrative determination of the same matters. Because what is just and proper in an individual case depends. to a great extent on factual determinations, and because the district court makes no findings of fact, but bases its conclusions on what there is reasonable cause to believe, its conclusion that something is or is not just and proper does not rest on the same foundation as a seemingly similar administrative determination in the same case and therefore cannot be relied upon in the administrative determination.

■ Relief under section 10(j) is "just and proper," and the district court may therefore grant it, "where the passage of time reasonably necessary to adjudicate the case on its merits convince[s] both the Board and the federal courts that the failure to grant such relief might dissipate the effective exercise . . ." of the Board's ultimate remedial power. *Kobell,* 731 F.2d at 1091. Interim relief under section 10(j) is meant to serve the public interest by effectuating the policies of the NLRA and fulfilling the remedial

function of the Board; it is not meant to vindicate the private rights of employees. *Eisenberg v. Wellington Hall,* 651 F.2d at 906–07.

In this case, respondent does not contest that its conduct meets the low standard applied by this court in determining whether there was reasonable cause to believe it engaged in unfair labor practices. In its brief, it states, "KNZ simply cannot boldly assert that there is an absence of a substantial legal theory or substantial facts to support the Board's theory of violation." Respondent's Brief at 4. Accordingly, respondent has agreed to the injunction with respect to the cease and desist order. At oral argument before the district court on the requested relief, respondent further stated that it does not oppose reinstatement of the two former employees. However, KNZ vigorously opposes the interim bargaining order. Because the respondent has agreed to the order against the unfair labor practices and for reinstatement, the court does not have to enumerate the unfair practices it has reasonable cause to believe were committed to justify granting those forms of relief; however, it must review them for purposes of determining whether an interim bargaining order is just and proper.

## II. WHAT THERE IS REASONABLE CAUSE TO BELIEVE

■ The following narrative sets out the factual background the court finds there is reasonable cause to believe.

In late January, 1994, one of KNZ's employees, Les Schlemback, contacted the Union to begin an organizing drive. Transcript of Proceedings ("Tr.") at 211, 212, 214. Schlemback and another employee, Jay Dallegro, met with a Union organizer at the Union hall on January 26, 1994. Tr. at 28, 212, 381. Thereafter, on February 9, Schlemback invited several of the employees in his unit to his apartment one evening to meet with two Union representatives. Tr. at 28–29, 150, 213–14, 382. The four employees who were at that meeting, Schlemback, Dallegro, Robert Fowler and Joe Bushby, signed Union authorization cards. Later the same

night, Dallegro visited two other employees, Mike Wojtecki and Jim Huffner, who also signed authorization cards. Tr. at 29–30, 151–52, 215–16, 382–86. The unit that was the subject of the organizing drive comprised all of KNZ's full-time and regular part-time window fabricators and installers, but excluded all other employees, guards and supervisors as defined in the NLRA. GCX 1(g), ¶ 8(a); GCX 1(k), ¶ 8(a). There were seven such employees, and on February 9, 1994, six of them signed cards authorizing the Union to represent them in collective bargaining.[4] One employee, Rich Quering, did not sign an authorization card. Tr. at 9–11, 223.

The Union authorization card stated:

I understand and agree that my execution of this authorization card will enable the Union to secure recognition from my Employer as my sole and exclusive collective bargaining representative, without the need for any election conducted by the National Labor Relations Board, or any other agency. By the execution of this card, I agree that the Union may act as my bargaining representative, and I authorize it to seek recognition from my Employer on the basis of my authorization card.

GCX 2, 3, 4, 7, 8, 13. After obtaining authorization from a majority of workers in the unit, the Union sent a letter, dated February 14, 1994, to KNZ president Al Nuhn demanding recognition as the exclusive collective bargaining representative of the unit and requesting bargaining. Tr. at 388, GCX 1(g) ¶ 12, 1(k) ¶ 12, GCX 14. KNZ refused and continues to refuse to recognize the Union or to bargain with it. GCX 1(g) ¶ 13, GCX 1(k) ¶ 13, Tr. at 390, 392–93.

█ There is reasonable cause to believe that, shortly after it learned of the Union organization drive, respondent engaged in numerous and serious unfair labor practices in violation of the NLRA. Section 7 of the NLRA, 29 U.S.C. § 157, guarantees "the right to self-organization, to form, join, or assist labor organizations to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection. . . ." Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in their exercise" of their section 7 rights. The test is whether the employer's conduct has a reasonable tendency to coerce; actual coercion is not necessary. *NLRB v. Garry Mfg. Co.*, 630 F.2d 934, 938 (3d Cir.1980); *Hedstrom Co. v. NLRB*, 629 F.2d 305 (3d Cir.1980). Section 8(a)(3), 29 U.S.C. § 158(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment . . . to discourage membership in any labor organization." Section 8(a)(5), 29 U.S.C. § 158(a)(5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, . . ." There is reasonable cause to believe the conduct of respondent violated sections 8(a)(1), (3), and (5) of the NLRA.

There is reasonable cause to believe that respondent violated section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5) by refusing to recognize or to bargain with it when the Union requested recognition and bargaining after a majority of unit members signed the authorization cards.

There is reasonable cause to believe that Al Nuhn, president of KNZ, violated the NLRA in numerous ways. On February 18, 1994, Al Nuhn telephoned Schlemback and, in the course of the conversation, interrogated Schlemback about his Union sympathies. Nuhn threatened loss of work, closing the business, declaring bankruptcy and reopening under another name if the employees chose the Union as their collective bargaining representative. He told Schlemback that the

---

4. KNZ contends there were either eight employees in the unit, including Mark Bekier, whom the Union excludes as a supervisor, or that there were fewer than seven in the unit, because if Bekier counts as a supervisor, so do others whom the Union seeks to include in the bargaining unit. The Union's position is that only Mark Bekier was actually a supervisor, and that there were therefore seven employees in the unit. As discussed below, the court finds there is reasonable cause to believe that Mark Bekier was a supervisor but that the others were not supervisors.

organization drive was futile because the company would not "go union" and accused employees who supported the Union of disloyalty to KNZ. Tr. at 224–25, 226, 227, 305, 703, 708, 709, 712. There is reasonable cause to believe that Nuhn's actions were in violation of section 8(a)(1) of the NLRA.

Nuhn interrogated other employees concerning their Union sympathies and activities and similarly threatened them. GCX 6 p. 2., Tr. at 228–29. Nuhn accused Dallegro of stabbing him in the back and promised improved benefits and terms and conditions of employment if Dallegro refrained from supporting the Union. Tr. at 38, 39. On February 25, 1994, a day after learning that another employee, Robert Fowler, was a member of the Union committee, Nuhn directed that Fowler be laid off. Tr. at 161, GCX 17, Tr. at 391–92. At the hearing, respondent contended it had laid off Fowler because of lack of work, but about the time Fowler was discharged, two new employees began work, doing tasks that Fowler had done. Tr. at 492, 565, 566, 766–67. Later, KNZ purportedly recalled Fowler, but offered him only short term work of a week or two at a greatly reduced wage ($5.90 per hour instead of $32 per hour). Tr. at 163–64. There is reasonable cause to believe Nuhn had Fowler laid off in retaliation when he learned of Fowler's Union activities and that these actions were in violation of sections 8(a)(1) and 8(a)(3) of the NLRA.

■■■ There is reasonable cause to believe that Mark Bekier was a supervisor at KNZ, within the meaning of section 2(11) of the NLRA, 29 U.S.C. § 152(11). The term "supervisor" is defined in the NLRA as follows:

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Since this section is written in the disjunctive, a supervisor need not engage in all of the enumerated activities; any one will suffice. *NLRB v. Berger Transfer and Storage Co.,* 678 F.2d 679, 687 (7th Cir.1982); *NLRB v. Baja's Place,* 733 F.2d 416, 420 (6th Cir.1984). Bekier has admitted that he had the authority to discipline and reward employees and that he did so. Tr. at 610, 611. There is also reasonable cause to believe he had the authority to adjust employees' grievances, arrange their assignments and work schedules, direct their daily work, and effectively to recommend hiring. Tr. at 60, 124, 125, 156, 235, 274–75, 278, 622.

In a footnote to its brief, KNZ contends that, if Bekier is a supervisor and is thereby excluded from the collective bargaining unit, so are certain other employees who are "lead employees" or "crew leaders" under the NLRA. Respondent's Brief an 9–10 n. 2. If they, too, are supervisors, KNZ contends the court would have to sort out representation issues to determine whether the Union had the support of a majority of the employees who were not supervisors. *Id.;* Tr. at 426–29, 433, 440, 449–60.

There is reasonable cause to believe that every project with two or more workers had a crew leader and that various employees were the designated crew leaders for particular projects, but that only Bekier had responsibility and authority for directing work, arranging schedules, and adjusting grievances that extended beyond single projects. For example, on one occasion, Jay Dallegro complained to president Nuhn about Mark Bekier regularly making employees work extra hours without extra pay, and Nuhn responded, "Don't complain to me, Mark's the boss," referring to Mark Bekier. Tr. at 44. Bekier stated that he and Nuhn made decisions as to job assignments. Tr. at 524–26. Bekier was the person to whom a physician wrote to report to KNZ on his treatment of an injury for which an employee was claiming workers' compensation and on his release of the worker back to the job. GCX 20, 21. Dallegro testified that he called Bekier on Sunday nights to see where he would work next, if he had not been told the week before by his

crew leader. Tr. at 96–97. When Les Schlemback was crew leader for a job on which he and another employee were working, Mark Bekier, who was not working on that job, went by the site, checked whether Schlemback was there, and reported back to KNZ vice-president, Debra Zarfoss. Tr. at 535–36. There is reasonable cause to believe that crew leaders were not, by virtue of that fact, supervisors, but that Mark Bekier was a supervisor within the meaning of section 2(11) of the NLRA, 29 U.S.C. § 152(11).

There is reasonable cause to believe that on February 21–25, 1994, supervisor Mark Bekier engaged in conduct in violation of the NLRA. He disparaged Schlemback in front of other employees because Schlemback supported the Union and said that no one would want to hire them after this and the employees would not make as much money if the employees selected the Union as their collective bargaining representative. Tr. at 48, 49, 236–37, 642. He did not let Schlemback, Dallegro and Fowler do their usual installation work, although there was such work to be done, and he said that Fowler was being assigned to clean up school yards and paint gutters as punishment for wanting to be in the Union. Tr. at 47–48, 156, 235. On February 22, when temperatures were 15–20 degrees Fahrenheit, Bekier assigned Schlemback, Dallegro and Fowler to caulk outside, despite the fact that inspectors had told KNZ they did not want caulking work to be done in such cold weather. Tr. at 49–51, 158–59, 239–40. On February 25, Bekier conveyed Nuhn's message to lay off Fowler, explaining that KNZ could not start any new jobs because of the Union. Tr. at 161. On March 8, 1994, Bekier asked Dallegro where he stood on the Union vote, and told him that he should distance himself from Schlemback because KNZ would soon be done with Schlemback. Tr. at 54. There is reasonable cause to believe that all these actions were in violation of sections 8(a)(1) and 8(a)(3) of the NLRA.

There is reasonable cause to believe that, in retaliation for Union activities and to discourage membership in the Union, respondent discriminated in regard to the terms and conditions and the tenure of Schlem-back's employment, making the terms and conditions less favorable, and eventually terminated him. On February 21, 1994, respondent took back the company truck Schlemback had been using, and during the week of March 21, 1994, respondent changed Schlemback's starting time and job site, segregating him from other employees. Tr. at 58–59, 60, 250–51, 252. On March 9, 1994, Bekier imposed onerous and meaningless job duties on Schlemback. Tr. at 55–57, 246–47, 249. Then, starting at the end of March, respondent issued oral and written warnings to Schlemback for conduct that did not draw warnings for other employees. GCX 10, Tr. at 62, 258–59, 767–68. Despite Schlemback's repeated requests that he not be given a work assignment that would be incompatible with a scheduled interview concerning his application for a position with the Pennsylvania State Police, respondent gave him the assignment. When he did not take it, respondent laid him off on April 15, 1994, and did not offer him work again. Tr. at 261–65, GCX 11. There is reasonable cause to believe that all of these actions occurred and were in violation of section 8(a)(3) of the NLRA.

On March 18, 1994, president Nuhn sent a letter to all employees attempting to repudiate and thereby cure his previous illegal activities, GCX 6; however, there is reasonable cause to believe the letter was inadequate to correct the damage that had been done. The Board has held that an employer may relieve himself of liability for unlawful conduct by repudiating the conduct, but to be effective, the repudiation must be timely, unambiguous, specific, and must not be followed by any unlawful conduct. *Pilliod of Mississippi, Inc.,* 275 NLRB 799, 809 (1985), 1985 WL 45540 at *18. The letter falls short in several respects, including the fact that much of the conduct there is reasonable cause to believe was illegal was not specifically repudiated. Perhaps the most serious respect in which president Nuhn's letter fails to cure the illegalities is that the chief Union supporter, Schlemback, was laid off a month after the letter was written and was not subsequently offered employment by KNZ. This dramatic action spoke much louder than the words of the letter.

Based on the conduct described above, there is reasonable cause to believe that respondent has violated sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA. There is also reasonable cause to believe that respondent's illegal behavior destroyed the status quo that existed just prior to its illegal behavior and undermined the strong pro-Union momentum that had developed among unit workers at KNZ. There is reasonable cause to believe respondent's response to the attempts to unionize was effective in discouraging unionization, consisting as it did of loss of work for two key Union supporters in a unit of seven and effective intimidation of other workers by this example and by threats and other intimidating conduct.

## III. WHAT IS JUST AND PROPER

Although the court has reasonable cause to believe that serious violations of the NLRA have occurred, it will not grant the requested relief unless it is "just and proper" to do so. As stated above, the only remaining contested relief is the interim bargaining order. The Board requests that the court order KNZ, on an interim basis, to recognize and, upon the Union's request, to meet and bargain in good faith with the Union as the exclusive collective bargaining representative of the employees in the unit.

 Respondent argues, first, that the Board has contributed to unreasonable delays so that there is no longer any urgency and the Board is not deserving of the requested injunctive relief. Respondent notes that the initial unfair labor charge was filed by the Union on March 9, 1994, and the Board did not file the petition for the injunction until September 7, some six months later. It further argues that, while the time span between commission of unfair labor practices and filing for interim injunctive relief is not, by itself, determinative of whether the court should grant relief, a period of six months suggests that whatever detrimental effects may have resulted from the unfair practices have already taken their toll on the organizational drive, so that an injunction would not be more effective than a final order from the Board following administrative review.

At oral argument, counsel for petitioner explained that some of the delay was due to the fact that the Board is neutral when charges are first filed. It is not until after it has investigated the charges that the Board decides whether to proceed in the case, and nearly two-thirds of charges filed before the Board are dismissed. In this case, while the Union's first charge of unfair labor practices was filed on March 9, its second charge was not filed until May 20, 1994, following respondent's lay-off of Schlemback. The Board issued a complaint and notice of hearing on June 30, 1994, about six weeks after the second unfair labor practices charge, and filed the petition for injunctive relief on September 7, a little over two months later. The petition by the Board for interim injunctive relief was thus filed less than four months after the last unfair labor charge.

In *Pascarell,* the court of appeals reasoned that a delay of six months between the last unfair labor charge and the petition for interim injunctive relief was not too long. *Pascarell,* 904 F.2d at 881. The court of appeals said, with respect to a district court's evaluation of the amount of time the Board is allowed to take before filing a petition, that "there is a certain leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme." *Id.* It went on to quote from an opinion of the United States Court of Appeals for the First Circuit, which noted, "The very fact that [the Board] must exercise discretion, and that its decision is entitled to presumptive weight ... indicate that it should have time to investigate and deliberate." *Id., quoting Maram v. Universidad Interamericana de Puerto Rico,* 722 F.2d 953, 960 (1st Cir.1983) (alterations in *Pascarell* ). While undue delay reduces the Board's credibility in arguing that the injunctive relief is necessary, given the ongoing and cumulative nature of the unfair labor practices in this case, as in *Pascarell,* and the necessity for careful deliberation, the court concludes the delay was not too long.

The Supreme Court set out the law with respect to bargaining orders in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). There, the

Court discussed the circumstances under which the Board can order an employer to bargain with a union that lost a representative election. If the union cannot demonstrate that it once had a majority, the Board may issue a bargaining order only in "exceptional" cases of "outrageous" and "pervasive" unfair labor practices. *Id.* at 613, 89 S.Ct. at 1940. However, where the union can demonstrate that it once had a majority, the Board may issue the order "in less extraordinary cases marked by less pervasive practices which nonetheless still have a tendency to undermine majority strength and impede the election process." *Id.* Orders granted under these two circumstances are called *Gissel I* and *Gissel II* bargaining orders, respectively. *NLRB v. Atlas Microfilming,* 753 F.2d 313, 316 (3d Cir.1985).

■ A *Gissel II* bargaining order is appropriate where (1) the illegal practices have the tendency to undermine majority strength and impede the election process; (2) the union had a majority at one point; and (3) the possibility of erasing the effects of past practices and of ensuring a fair election by the use of traditional remedies, though present, is slight and employee sentiment once expressed through authorization cards would, on balance, be better protected by a bargaining order. *Gissel,* 395 U.S. at 614–15, 89 S.Ct. at 1940–41.

■ In this case, it is appropriate to consider a *Gissel II* bargaining order, and the court concludes the petitioner has met the requirements under *Gissel* for such an order. First, there is reasonable cause to believe that respondent's illegal practices had the tendency to undermine majority strength and impede the election process. After respondent laid off two key Union supporters, Fowler and Schlemback, repeatedly threatened a third, Dallegro, and interrogated others, momentum toward unionization came to a halt. There is reasonable cause to believe it did so because the remaining unit employees were intimidated by respondent's illegal conduct and feared they might suffer the same fate as Fowler and Schlemback if they pursued unionization.

Second, there is reasonable cause to believe the Union had a majority at one point.

A majority of unit workers supported the Union when they signed the Union authorization card on February 9, 1994. In *Gissel,* in determining whether a majority of unit employees once supported the Union, the Supreme Court held that it would examine the language of the authorization cards the employees signed, stating that "employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language on the card." *Gissel,* 395 U.S. at 606, 89 S.Ct. at 1936. Here, six of the seven unit employees signed cards stating, in part:

> I understand and agree that my execution of this authorization card will enable the Union to secure recognition from my Employer as my sole and exclusive collective bargaining representative, without the need for any election conducted by the National Labor Relations Board, or any other agency.

GCX 2, 7, 8, 13. This clear language explicitly authorized the Union to be the collective bargaining agent, even in the absence of an election, and the fact that six of the seven unit workers signed the cards shows majority support for the Union.

■ Third, there is reasonable cause to believe that the possibility of erasing the effects of respondent's past practices and of ensuring a fair election by the use of traditional remedies is slight and employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order. The court considers a number of factors in making this determination, including the seriousness of the alleged unfair labor practices, their continuing impact, the rank of the officials committing them, their timing, and the number of employees affected. *NLRB v. Atlas Microfilming,* 753 F.2d at 318–319; *see also, Hedstrom,* 629 F.2d at 312; *Astro Printing Services, Inc.,* 300 NLRB 1028, 1990 WL 255534 (1990).

The unfair labor practices in this case were extremely serious: laying off key Union activists, interrogating others, and threatening them with plant closure. Those committing

the practices included the highest officials of the company: the president of the company himself made many of the threats, he and the vice-president made decisions to take illegal actions, and the vice-president and the field superintendent, Mark Bekier, carried them out. Respondent began its campaign of intimidation within a few days of learning of the Union drive. Most if not all of the unit employees were affected by respondent's actions by being threatened and intimidated, if not by being laid off. The court concludes petitioner has met the requirements enumerated by the Supreme Court for a *Gissel II* bargaining order.

Because the request is for an interim order from the district court, rather for an order from the Board, there is an additional requirement. The district court may grant an interim bargaining order, or any other relief under section 10(j) to preserve or restore the status quo "where the passage of time reasonably necessary to adjudicate the case on its merits convince[s] both the Board and the federal courts that the failure to grant such relief might dissipate the effective exercise ..." of the Board's ultimate remedial power. *Kobell,* 731 F.2d at 1091.

Respondent argues that a bargaining order would not be "just and proper" because it would create a new status quo and not merely preserve the old status quo. As the Third Circuit stated in *Pascarell,*

> it is just and proper to issue a § 10(j) injunction when the nature of the alleged unfair labor practices are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation.

*Pascarell,* 904 F.2d at 878. In a footnote to this passage, the court of appeals said,

> We think it important to emphasize that the relevant status quo is not the situation as it was before the Board filed its petition, but the situation as it was right before the alleged unfair labor practices took place.

*Id.* n. 5. In this case, the relevant status quo is the situation in the few days after six of the seven unit employees had signed Union authorization cards, but before KNZ began to threaten, intimidate and lay off employees for their Union activities.

At this point, there is no question of *preserving* the status quo that existed before respondent began its campaign of intimidation. That no longer exists, and there is reasonable cause to believe it was destroyed by respondent's actions. The question is how the status quo can best be restored. At the time respondent's illegal actions began, Union support and momentum was strong; the Union was ready to hold an election within a matter of weeks, on April 1, 1994. Tr. at 723. But since that time, the Union has not tried to hold an election because, as it acknowledged in oral argument, it did not believe it could win. There is reason to believe the chilling effect of respondent's illegal actions is still present, and the longer it goes without remedy, the more profound it is likely to be. As the Supreme Court has noted, "in the labor field, as in few others, time is crucially important in obtaining relief." *NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 430, 87 S.Ct. 559, 565, 17 L.Ed.2d 486 (1967).

Respondent's position is that whatever harm might have been done by its actions is already done, and it will not matter whether a remedy is put into effect six months from now, if this judgment is appealed and affirmed, or a year or two year from now, if a similar order by the Board goes through the process of appeal. Therefore, it argues, there is no urgent need for the interim injunction and one should not be granted. However, as the Supreme Court stated in *Gissel:*

> Such an argument ignores that a bargaining order is designed as much to remedy past ... damage as it is to deter future misconduct. If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to reestablish the conditions as they existed before the employer's unlawful campaign.

*Gissel,* 395 U.S. at 612, 89 S.Ct. at 1939 (footnotes omitted). Furthermore, petitioner contends that a union's collective strength, an essential element for meaningful collective bargaining, can be seriously eroded during the litigation process where, as here, no good faith negotiations are occurring. It quotes a court of appeals as saying:

> Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees.

*International Union of Electrical, etc. v. NLRB,* 426 F.2d 1243, 1249 (D.C.Cir.), *cert. denied,* 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970).

The court does not accept respondent's position that, at this point, the passage of time makes no difference in the harm to the negotiating process and consequently to the public interest. There is reasonable cause to believe that the respondent has been entirely successful up to this point in forestalling Union activity, and the longer an employer's illegal actions are, in effect, rewarded, the less meaningful is any promise of remedial action or any remedial action that eventually occurs. An employer who is able to keep a union at bay illegally for two or three years does far more damage to the process of negotiation, and consequently to the public interest, than one which prevails for only a year or so before an interim bargaining order is in place. Even if the employer appeals the interim order, the entire process is shortened by its issue.

Schlemback testified that he would not accept an offer of reinstatement without Union recognition and protection. Tr. at 345. His evident concern about reprisals and the absence of any Union activity among the employees since Schlemback's lay-off suggest that the workers still see the potential for abuse and retaliation by respondent as too great for them to undertake again the risks associated with unionization. There is reasonable cause to believe that respondent illegally laid off Schlemback even after ostensibly repudiating its illegal actions. In this environment, in which employees and former employees reasonably perceive respondent as still being actively hostile to the Union and are afraid to risk Union activity, there is a need to try to restore as soon as possible and insofar as possible the status quo as it existed immediately before respondent began to engage in unfair labor practices. Where, as here, there is reasonable cause to believe the possibility of erasing the effects of respondent's past practices and of ensuring a fair election by the use of traditional remedies is slight and lessens with the passage of time, an interim bargaining order is appropriate.

Respondent argues that recognizing the Union in an interim bargaining order would create a new status quo because KNZ has never recognized the Union as the bargaining representative of its employees, has never bargained with the Union, and the Union has not been certified in an election. KNZ argues that it is not just and proper for it to be ordered to recognize and bargain with the Union "on the sole basis that the Union had at one point in time attained majority status as evidenced by the execution of authorization cards." Respondent's Brief at 10. Respondent further argues that "there remains a distinct likelihood that the Union does not represent a majority of the workforce...." *Id.* at 19.

Of course, the support for the Union as shown by the authorization cards is not the "sole basis" for the interim bargaining order; as discussed above, that is only one of three factors that the court had to consider in determining whether a *Gissel II* bargaining order was appropriate. *Gissel,* 395 U.S. at 614–15, 89 S.Ct. at 1940–41. And while it is desirable for the employees to express their preference in an election, where, as here, the language of the authorization card is clear, the Supreme Court has held that authorization cards signed by a majority of unit workers are a valid expression of the employees' preference. *Gissel,* 395 U.S. at 606, 89 S.Ct. at 1936. If respondent is correct that there remains a "distinct likelihood" that the Union does not now represent a majority of the unit, when all but one of the unit employees supported the Union before

respondent began its unfair labor practices, then that is additional evidence of the damage to the negotiating process from those practices. Where, as here, the status quo the court seeks to preserve has been destroyed by unfair labor practices, it is not feasible to restore it exactly, and the alternative to granting an interim bargaining order is to allow the bargaining process to be further weakened and eroded by the passage of time, the court concludes that an interim bargaining order is indeed an appropriate interim remedy.

### III. CONCLUSION

For the foregoing reasons, the court will grant the petition for an interim bargaining order, in addition to the other relief on which the parties have agreed.

An order appropriate follows.

### *ORDER*

AND NOW, this day of March, 1995, upon consideration of the petition of Francis W. Hoeber, Acting Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, for interim injunctive relief under section 10(j) of the National Labor Relations Act ("NLRA"), the response of respondent, KNZ Construction, Inc., and the submissions thereto, and after oral argument on the petition, **IT IS HEREBY ORDERED** that the petition is **GRANTED,** and, on an interim basis, pending final disposition of the matters involved herein pending before the National Labor Relations Board,

Respondent, its officers, representatives, agents, servants, employees, attorneys, successors, assigns, and all persons acting in concert or participation with it or them:

(A) will, as agreed, on an interim basis, cease and desist from the following labor practices:

(1) threatening employees

(a) with discharge or unspecified reprisals;

(b) with the "shut down" of the company, bankruptcy and reopening under a new name with new employees earning a lower wage rate;

(c) that respondent will not seek work in Philadelphia;

(d) that respondent will lose work if its employees select the Union as their bargaining representative; and

(e) that prospective employers will not hire employees who support the Union;

(2) interrogating employees concerning their Union sympathies or activities and the Union sympathies or activities of other employees;

(3) indicating to employees that it would be futile for them to select the Union as their collective bargaining representative;

(4) accusing employees of disloyalty because they support the Union;

(5) promising employees increased benefits and improved terms and conditions of employment in order to discourage them from selecting the Union as their collective bargaining representative;

(6) disparaging employees in front of other employees because they support the Union;

(7) warning employees not to associate with other employees who support the Union;

(8) telling employees that employees who engage in Union activities need closer scrutiny;

(9) directing employees to inform respondent concerning their Union sympathies;

(10) changing job duties, job site assignments or working hours, assigning onerous or meaningless duties, disciplining, laying off or discharging employees in retaliation for their support of the Union;

(11) in any other manner, interfering with, restraining or coercing employees in the exercise of the rights guaranteed in section 7 of the NLRA;

(12) in any other manner, discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, in order to discourage membership in a labor organization;

(B) will, as agreed, on an interim basis, offer reinstatement to former employees Leslie Schlemback and Robert Fowler to their former positions without prejudice to

their former seniority or other rights and privileges previously enjoyed, or if their positions no longer exist, to substantially equivalent positions, displacing, if necessary, any other persons hired or reassigned by respondent as their replacements;

(C) will, as agreed, on an interim basis, remove and rescind any written warnings to Schlemback and will not rely upon such warnings;

(D) will, on an interim basis, recognize and, upon the Union's request, meet with and bargain in good faith with the local 252 of the Glaziers and Architectural Metal Workers Union, International Brotherhood of Allied Trades, AFL–CIO, as the exclusive collective bargaining representative of the employees in the unit comprising all the full-time and regular part-time window fabricators and installers employed by respondent, but excluding all other employees, guards and supervisors as defined in the NLRA.

With respect to composition of the bargaining unit under the interim bargaining order, Mark Bekier will be excluded as a supervisor and agent under sections 2(11) and 2(13) of the NLRA. The other unit employees whom petitioner contends belong in the unit, namely, Joseph Bushby, Jay Dallegro, Robert Fowler, Jim Huffner, Richard Quering, Leslie Schlemback and Mike Wojtecki, were unit employees at all pertinent times and will be included in the bargaining unit;

(E) will, as agreed, on an interim basis, post copies of this Memorandum and Order at its Dallastown, Pennsylvania facility, and in all locations where respondent's notices to employees are customarily posted, maintain these postings during the Board's administrative proceeding free from all obstructions and defacements, and grant to agents of the Board reasonable access to its facility to monitor compliance with this posting requirement; and

(F) will, within twenty (20) days of the date of this order, serve upon this court and petitioner a sworn affidavit from a responsible official of respondent which states with specificity the manner in which respondent has complied with the terms of this order.

This order shall expire six months from the date it is filed with clerk of the district court; provided, however, that petitioner may move for this order to be extended for an additional period of thirty days if it appears that the final decision of the National Labor Relations Board on the underlying unfair labor practice Consolidated Complaint in cases 4–CA–22570 and 4–CA–22773 is imminent.