**Peter W. HIRSCH, Regional Director of the Fourth Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**CORBAN CORPORATIONS, INC., d/b/a Encor Coatings, Inc., Respondent.**

**Civil Action No. 96–6470.**

United States District Court, E.D. Pennsylvania.

Dec. 5, 1996.

National Labor Relations Brd., Fourth Region, Philadelphia, PA, for Carmen P. Cialino, Jr.

Ross & Hardies, New York City, for Richard A. Wilsker.

Adelman Lavine Gold and Lavin, Philadelphia, PA, for Alan I. Moldoff.

## MEMORANDUM

JOYNER, District Judge.

Before the Court is a petition by Peter W. Hirsch, Regional Director of the Fourth Region of the National Labor Relations Board ("Petitioner" or "Board"), for interim injunctive relief under section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j). The Board seeks this relief pending its adjudication of an unfair labor practices complaint filed by Local 365, International Union of United Automobile, Aerospace and Agricultural Implementation Workers of America (the "Union") against Respondent Corban Corporation, Inc. d/b/a Encor Coatings, Inc. ("Respondent" or "Encor") for alleged violations of § 8(a)(1) and (3) of the NLRA.[1] Specifically, Petitioner asks this Court to order Encor to reinstate its former employee Jeremiah Mahoney ("Mahoney"), whom it discharged on March 18, 1996, and to rescind the disciplinary measures imposed on him, pending the Board's final disposition of the Union's complaint regarding Mahoney's termination.

This Court heard evidence regarding the Board's petition at a show cause hearing on October 10, 17 and 18, 1996.[2] While all of the testimony and exhibits presented by both parties inform the decision we announce today, a comprehensive recitation of the record is not necessary to explain the grounds for our ruling. Further, a § 10(j) petition does not require this Court to make formal findings of fact. *Hoeber v. KNZ Const., Inc.*, 879 F.Supp. 451, 455 (E.D.Pa.1995). We therefore begin by articulating the legal standards governing this petition. After identifying these standards, we then analyze the relevant aspects of the factual record in light of them, and explain why the Board's petition must be denied.

## DISCUSSION

### I. Standard for Granting a Section 10(j) Injunction

The standards governing the Board's petition are well-settled. Interim injunctive relief may be granted under § 10(j) without the showing of irreparable harm and likelihood of success on the merits ordinarily required for preliminary injunctive relief. *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1078 (3d Cir.1984). Rather, in evaluating whether such relief is appropriate here, we must determine whether (1) there is "reasonable cause" to believe that an unfair labor practice has occurred and (2) whether an injunction would be "just and proper." *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 877 (3d Cir.1990).

Under the first prong of this test, Petitioner has the "relatively insubstantial burden," *Suburban Lines*, 731 F.2d at 1084, of demonstrating that there is reasonable support for its position that an unfair labor practice has occurred. *Vibra Screw*, 904 F.2d at 882; *Hoeber*, 879 F.Supp. at 455. The inquiry under this prong is twofold. First, we must find that the Board's legal theory is "substantial and not frivolous." *Suburban Lines*, 731 F.2d at 1084. Then,

---

1. Section 8 of the NLRA provides in relevant part that
 (a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 (3) by discrimination in regard to hire or tenure of employment or any term or condi-

 tion of employment to encourage or discourage membership in any labor organization. 29 U.S.C. § 158.

2. Citations to the record are to the transcripts of this hearing. Volumes I, II and III correspond to October 10, 17 and 18, respectively.

viewing the facts in the light most favorable to the Board and without resolving credibility issues raised by the evidence, we must find sufficient support for its proffered theory. *Id.; KNZ Const.,* 879 F.Supp. at 455; *Hirsch v. Konig,* 895 F.Supp. 688, 692 (D.N.J.1995).

 If there is reasonable cause to believe that an unfair labor practice has occurred, we then ask whether imposition of the interim relief requested would be "just and proper." Section 10(j) injunctions are intended to serve the public interest by effectuating the NLRA's policies and fulfilling the Board's remedial function. *Eisenberg v. Wellington Hall,* 651 F.2d 902, 907 (3d Cir. 1981); *see also KNZ Const.,* 879 F.Supp. at 455 (section 10(j) "is not meant to vindicate the private rights of employees"). Thus, our Court of Appeals has held that

> it is just and proper to issue a § 10(j) injunction when the nature of the alleged unfair labor practices are likely to jeopardize' the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation.

*Vibra Screw,* 904 F.2d at 878.[3] An injunction should issue where, given "the passage of time reasonably necessary to adjudicate the case on its merits : . .[,] the failure to grant such relief might dissipate the effective exercise of [the Board's ultimate remedial] power." *Suburban Lines,* 731 F.2d at 1091; *see also Konig,* 895 F.Supp. at 692–93; *KNZ Const.,* 879 F.Supp. at 455. The "critical determination" is therefore "whether, absent an injunction, the Board's ability to facilitate peaceful labor negotiation will be impaired." *Vibra Screw,* 904 F.2d at 879.

We now analyze the record in this case in light of these standards.

*II. Analysis of the Record in this Case*

 As a threshold matter, we note that the Board's legal theory is clearly "substantial and not frivolous." *Suburban Lines,* 731 F.2d at 1084. Petitioner alleges that Encor unlawfully disciplined and then discharged

the plant's lead Union activist just as the Union was returning from a nine year exile and the collective bargaining process was about to resume. The critical question is whether there is sufficient evidentiary support for this theory.

*A. What There is Reasonable Cause to Believe*

*1. The History of Union Activity at the Plant*

Encor is a Pennsylvania corporation that has been engaged in the operation of a steel coatings plant in Bath, Pennsylvania since 1989. Rec. at I–9, 12. When Encor purchased the Bath facility, the plant's prior owner, A.J. Ross Logistics ("AJR"), was a respondent in Board proceedings involving an unfair labor practices complaint. Pet.Ex. 1; Rec. at I–10–11. In 1988, the Board found that AJR had violated § 8(a)(1), (3) and (5) of the NLRA by refusing to rehire certain employees of M.C.P. Facilities ("MCP"), which owned the plant before AJR, and by refusing to bargain with the Union. Pet.Ex. 1; Rec. at I–10–11. To remedy these violations, the Board ordered AJR, its successors and assigns to bargain with the Union, reinstate the former MCP employees, and compensate those who suffered losses as a result of the discrimination. Rec. at I–11–12; Pet.Exh. 1; *AJR Coating Division Corp.,* 292 NLRB 148, 1988 WL 214286 (1988). AJR did reinstate the former MCP employees, but eventually went bankrupt and had no assets with which to pay its backpay obligation, which exceeded one million dollars. Rec. at I–12, II–7, 12–14.

Though Encor did not recognize or agree to bargain with the Union when it took over the plant, the Union did not file an unfair labor practices charge at this time. Rather, there is reasonable cause to believe that, from 1989 to 1992, the Union and the Encor had an informal relationship. Rec. at I–16–17, 48–49. During this period, the Union business agent assigned to the plant, Gerald Dankulich ("Dankulich"), and an employee representative met approximately monthly

---

**3.** The *Vibra Screw* court specified that "the relevant status quo is not the situation as it was before the Board filed its petition, but the situa-

tion as it was right before the alleged unfair labor practices took place." 904 F.2d at 878 n. 5.

with Encor's then-Vice President, Ronnie Ferrer ("Ferrer") to discuss matters such as shift and job assignments, and cleanliness of the plant. Rec. at I–16, 62. These meetings ceased in 1992 shortly after the Union, in response to Encor's changing the medical insurance available to its employees, wrote demanding formal recognition. Rec. at I–17–18, II–75. Encor refused on the grounds that it was under no legal obligation to bargain with the Union. Rec. at II–75. Soon after, it terminated the informal meetings and informed Dankulich and the employee rep that all further communications were to be "handled through the attorneys." Rec. at I–18. Still, the Union did not file an unfair labor practices charge. *Id.* In July of that year, Encor petitioned for Chapter 11 bankruptcy, from which it did not emerge until March, 1994. Rec. at III–21, 34.

In late 1994, the events that the Board alleges led to Mahoney's firing began to unfold. On November 1 of that year, the Board issued an amended compliance specification regarding AJR's unfair labor practices in which the Board claimed that Encor was AJR's successor for purposes of backpay liability. Pet.Exh. 8; Rec. at II–7–10, 67. In September 1995, the Board issued an amendment to the amended compliance specification in which it directed Encor to bargain with the Union. Pet.Exh. 9; Rec. at II–14–16, III–22. In response to these two proclamations, the Board, Encor, and the Union entered into negotiations that culminated in a settlement executed by the parties' attorneys on February 14, 1996, approved by the Board on March 19, 1996 in an order later enforced by the Third Circuit, and approved by the Bankruptcy Court on April 3, 1996. Rec. at II–28–32; Pet.Exh. 12, 16, and 17. As part of this settlement, Encor agreed to pay $200,000 to settle the backpay claims and to recognize and bargain with the Union. Rec. at I–21, II–16–17, III–22–23.

Formal bargaining between Encor and the Union commenced in April 1996. Rec. at II–37. The parties met twice in April, once in June, and again in October. Rec. at II–49. As of the time of the show cause hearing, no final contract had been reached and the two sides were far apart on many critical issues,

such as starting wage rates and job classifications, health and pension plans, and union security. Rec. at II–53–60. The Union's counsel Gene Eisner ("Eisner") described the meetings as "quote unquote, cordial," but that "we're not being offered anything." Rec. at II–46. Eisner testified further that, while Encor had come "perilously close to bargaining in bad faith," no unfair labor practices charge has been filed against Encor for its tactics. Rec. at II–61.

The only non-Union official to represent Local 365 in these negotiations thus far has been Jerry Mahoney, who was designated to be part of the bargaining committee only after his discharge. Rec. at I–156–58, II–40, 42, 77. No other employee has been willing to join this committee since Mahoney's firing. Rec. at I–102–6, II–42. The Board contends that Encor's unlawful discharge of Mahoney has produced a chilling effect among the workforce that this Court can only undo by ordering his reinstatement pending final NLRB disposition of his claim. We turn now to the heart of the instant petition, namely, whether there is reasonable cause to believe that Mahoney's discharge was in fact unlawful.

### 2. Mahoney's Employment History, Union Activity and Eventual Discharge

Mahoney began working at the Bath facility in November, 1974. Rec. at I–58. In his twenty-two years at the plant, he performed various jobs for his three employers, including operating cranes and shop machinery, sand blasting, spray painting, and mixing paint. Rec. at I–59, II–164. A member of the Union when it was formally recognized by MCP, Mahoney was one of the employees whose reinstatement by AJR had to be ordered by the Board. Pet.Exh. 8; Rec. at II–9. The nature and extent of Mahoney's Union activities after Encor purchased the plant in 1989, and Encor's awareness of these activities, were hotly contested at the show cause hearing. We therefore recite the facts that we have reasonable cause to believe, remaining mindful of the Board's "relatively insubstantial burden" in this regard.

We have reasonable cause to believe that Mahoney was the Union's "lead contact" at

the plant after the departure of former employee Donald Donello ("Donello") in the "early 1990's" until his termination on March 18, 1996. Rec. at I–14–15. After Donello left, it was Mahoney that kept Dankulich abreast of "problems at the shop" and "things that he thought were improper," like Encor's change in medical insurance in 1992. Rec. at I–14. Mahoney also replaced Donello as the employee representative at the informal monthly meetings with Dankulich and Ferrer that occurred until 1992. Rec. at I–14, 62. After these meetings stopped, Mahoney remained Dankulich's "chief contact" at the plant from 1992 to 1995, informing him of employee concerns and, on at least two occasions, forwarding written grievances to him on behalf of other employees. Rec. at I–19–20, 36, 73–74.

We also find reasonable cause to believe that Encor's management had become aware of Mahoney's Union activity by early 1996, although the evidence in this regard is not very strong. It is undisputed that Mahoney did not engage in any "overt Union activities" on company property or company time after 1992, and that he was not an elected official, steward, or formally recognized Union representative at any time while he was in Encor's employ. Rec. at I–34–35, 38, 118, II–201, III–56–57. Moreover, Ferrer, the only Encor representative who met with Mahoney in even a quasi-official Union capacity as a participant in the informal meetings from 1989 to 1992, was fired in 1992. Rec. at III–18. Still, by viewing Mahoney's testimony concerning two alleged conversations in February of 1996 with Plant Quality Manager Dennis Gleason in the light most favorable to the Petitioner, we find that it has satisfied its slim burden of proof on this critical issue. Mahoney twice inquired into the status of the settlement negotiations between the Union and Encor based on information to which only one in close contact with Union officials would have access, to a manager whose brother and father are the company's CEO and President, respectively. Rec. at I–76, 77. This is sufficient to create an inference of knowledge on Encor's part for § 10(j) purposes. *See Hicks Oils & Hicksgas, Inc.,* 293 NLRB 84, 1989 WL 223829 (1989) (finding knowledge on Employer's part where Union activist asked Respondent's Vice President about "the possibility of the [plant] going Union" and the official responded that the situation would be "out of his hands"), *enf'd* 942 F.2d 1140 (7th Cir.1991).

We conclude, however, that despite this awareness, there is no reasonable cause to believe that Mahoney's discharge the month after these two conversations was based on anti-Union animus.[4] The following facts are undisputed. On March 13, 1996, Encor received an order from Michelman–Cancelliere ("Michelman"), a Bath, Pa, steel fabricator, for work on and delivery of stringers, 80–foot long steel structures weighing approximately 15–20 tons that are used to undergird bridges. Rec. at I–88–89; Resp.Exh. 11. This was a rush order, with a delivery deadline of Monday, March 18. Rec. at II–138, 167. Though Encor had done "small little jobs" for Michelman on prior occasions, this was Encor's "first major job" for this important new client. Rec. at III–27. Mahoney was on the crew that worked overtime on this job from 6 a.m. to 2 p.m. on Saturday, March 16th. Rec. at I–88–89; Resp.Exh. 1. At about noon that day, Richard Miller ("Miller"), a supervisor who had been a Union member when the plant was owned by MCP, assigned Mahoney to mix Conlux aluminum paint. Rec. at I–90–91. Though Mahoney testified that he had never mixed this type of paint before, he did have experience mixing paint where he was required to determine the correct ratio of the ingredients. Rec. at

---

4. We do not address whether there is reasonable cause to believe that Mahoney was unlawfully threatened and disciplined in concluding that there is no such cause to believe his termination was unlawful. Assuming *arguendo* that there is sufficient cause to believe that these violations did occur, the evidence in this case clearly indicates that Mahoney was justifiably discharged for cause. In other words, Encor has established that Mahoney would have been discharged absent the protected conduct. *See N.L.R.B. v. Transportation Management Corp.,* 462 U.S. 393, 403–04, 103 S.Ct. 2469, 2475–76, 76 L.Ed.2d 667 (1983). Further, we find that § 10(j) relief would be inappropriate to remedy the disciplinary measures alone because such relief "is not meant to vindicate the private rights of employees." *KNZ Const.,* 879 F.Supp. at 455.

Moreover, as we discuss *infra,* the interim relief requested is not just and proper in any event.

I-59, 116–17. The directions for mixing the Conlux paint were printed on the cans Mahoney was assigned to mix. Rec. at I–180–81. Mahoney, despite the fact that he is farsighted, was not wearing his glasses when he read these directions. Rec. at I–180–82. Mahoney incorrectly mixed both the quantity and the type of paint, which, when applied to the stringers, did not dry. Rec. at II–135–36. As a direct result of this error, the following otherwise unnecessary work had to be performed: the paint had to be scraped off, a task made more difficult by its wet, sticky texture; the stringers had to be re-blasted; the re-blasting residue had to cleaned off; and then the stringers had to be measured, masked, and re-painted. Rec. at I–173, II–130, 132, 167–69; Resp.Exh. 1. Monday's regular production schedule had to be altered so that the shipping deadline could be met. On Monday, March 18, 1996, Encor CEO Edward Gleason, Jr. ("Gleason, Jr."), after investigating the incident and upon the recommendation of Plant Superintendent Reggie Lewis ("Lewis"), decided to terminate Mahoney. Rec. at II–171–73. Mahoney was informed of his termination that day.

The Board argues that, despite these undisputed facts, Encor nonetheless violated § 8(a)(3) by discharging Mahoney. First, Petitioner contends that significant blame for Mahoney's mistake lies with Miller. Mahoney testified that, in keeping with the common practice at Encor of seeking help from supervisors, he sought Miller's advice as to whether he had correctly mixed the Conlux paint. Rec. at I–93. Mahoney claims that a hurried Miller told Mahoney to "check it yourself, you old stupid bastard." *Id.* Crediting Mahoney's story as true, however, the facts remain that the relatively simple instructions were printed on the cans themselves, Mahoney did not wear his glasses when he read these instructions, and he did not retrieve his glasses and re-check the directions after Miller refused to help him. Rec. at I–180–182. The testimony of Encor

paint mixer Dennis Valo that Lewis and Miller had helped him mix Conlux on a prior occasion does not alter these facts. Rec. at II–211–13. Thus, even assuming Miller did refuse to help Mahoney, Mahoney was still undeniably negligent in mixing the paint.

Petitioner next argues that Encor's anti-Union animus is apparent from Gleason, Jr.'s failure to hear directly from Mahoney regarding his version of the events before deciding to terminate him. Gleason, Jr. made his decision, however, based on the recommendation of Lewis, who did directly discuss the incident with Mahoney. Rec. at I–96. Mahoney testified, in fact, that he "explained everything" to Lewis upon returning from work that very afternoon. *Id.* Lewis, in turn, conferred with Miller, Mike Ahn (another supervisor), Brian Green (one of Mahoney's co-workers on the crew that day), Gleason, Jr., Dennis Gleason, and one other individual before preparing a memo to Gleason, Jr in which he recommended termination. Rec. at I–170–71; Resp.Exh. 1. We agree with Encor that its investigation was clearly more extensive than the respondent's in *Dunbar v. Northern Lights Enterprises, Inc.,* 942 F.Supp. 138, 153 LRRM (BNA) 2457 (W.D.N.Y.1996), where the employer failed even to speak to the employees whose complaints were the basis of the termination. We therefore find no reasonable cause to believe that Encor's decision to discharge Mahoney was anything but adequate.

■ Petitioner also charges Encor with exaggerating the extent of the loss caused by Mahoney's negligence. Specifically, the Board argues that Encor's documentary evidence does not support its claim that Mahoney's error caused between $4000 and $5000 damage. Rec. at II–229–30. We agree with Petitioner that we must draw a limited adverse inference from Encor's failure to produce production records adequately documenting these costs. *See Int'l Union, UAW v. NLRB,* 459 F.2d 1329, 1344–45 (D.C.Cir. 1972).[5] We concur with Encor, however, that

5. We decline to apply the exception to the rule that excuses a party's failure to produce helpful, relevant evidence where the party "has good reason to believe he will prevail without introduction of all of his evidence, [and] it would be unreasonable to draw any inference from a fail-

ure to produce some of it." *Int'l Union, UAW,* 459 F.2d at 1344. Indeed, this exception appears to this Court to cut against the very judgment underlying the rule, namely, "that a party will introduce all relevant evidence which is fa-

"taking only the work as to which there is no dispute, the magnitude of the error was clearly significant." Resp.Post–Hrg.Br. at 20. Respondent accurately summarizes the evidence as follows:

> Miller and three other employees spent the entire first shift on Sunday in re-blasting the stringers. The re-blasting carried over into the second Sunday shift, with at least four employees working until 3 or 4 p.m. It then took another five hours to prepare and re-coat the stringers, including about two hours to actually spray the paint on the stringers. All of these hours were paid for at overtime rates.

*Id.* at 20–21 (citations to record omitted). Further, the enormous stringers had to be moved between buildings as well as handled within them. Rec. at II–207–8. Though a small portion of this work was apparently performed by guards who otherwise would have been working anyway, Rec. at II–168, 193–94, we find no reasonable cause to believe that the cost of Mahoney's error was not significant, in both monetary and time pressure terms. *See N.L.R.B. v. Electro–Voice, Inc.,* 83 F.3d 1559, 1570 n. 17 (7th Cir.1996) (holding that Petitioner failed to establish a "better than negligible chance that an anti-union animus motivated" discharge of employee who "destroyed several thousand dollars worth of equipment").

Finally, the Board contends that Mahoney's discharge was inconsistent with Encor's past practices in situations of similar magnitude. Without belaboring this point, we simply note our agreement with the Board's contention that the evidence adduced at the hearing fails to support Petitioner's theory. Indeed, the Board appears to recognize the weakness in this line of argument by largely abandoning it in its own post-hearing briefs.

We therefore find that though there is reasonable cause to believe that Encor was aware of Mahoney's status as a Union activist when it took the actions challenged here, we have no such cause to believe that Encor's discharge of Mahoney was unlawful. In short, we agree with Encor that it "had the right to require its experienced employees to read simple instructions correctly." Resp.'s

Post–Hr'g Br. at 17. Though this finding alone is sufficient to justify denying Petitioner's request for a § 10(j) injunction, we now explain why imposing the injunctive relief Petitioner seeks would not be "just and proper" even assuming *arguendo* that Encor had engaged in the unfair labor practices alleged.

### B. Whether Reinstating Mahoney Would Be Just and Proper

■ As noted *supra,* § 10(j) "is not meant to vindicate the private rights of employees." *KNZ Const.,* 879 F.Supp. at 455. Rather, the "critical determination" in deciding whether to grant a § 10(j) injunction is "whether, absent an injunction, the Board's ability to facilitate peaceful labor negotiation will be impaired." *Vibra Screw,* 904 F.2d at 879. In particular, "[r]einstatement is appropriate if the court finds that the termination of respondent's employees resulted in a 'chilling effect' on co-employees." *Lightner v. Dauman Pallet, Inc.,* 823 F.Supp. 249, 253 (D.N.J.1992), *aff'd mem.* 993 F.2d 877 (3d Cir.1993).

■ Petitioner did produce limited evidence that Encor's allegedly unlawful actions produced a "chilling effect" among its employees. Mahoney testified to the reaction of an Encor employee to his termination and to the responses of several employees to his request to join the bargaining committee. Rec. at I–86, 102–6. This Court admitted all but one of these statements under the state of mind exception to the hearsay rule. *See* Fed.R.Evid. 803(3). While this rule provides for the admissibility of such statements for the actual state of mind expressed therein, they are not admissible to prove the cause of that state of mind. *See U.S. v. Emmert,* 829 F.2d 805, 809–10 (9th Cir.1987); *United States v. Cohen,* 631 F.2d 1223, 1225 (5th Cir.1980). Thus, Mahoney's testimony here is admissible to prove that the employees that he asked to join the bargaining committee expressed "fear of losing [their jobs]," Rec. at I–104, but not to prove what caused this fear. Still, we agree with Petitioner that an inference may be drawn from this state of mind that, if corroborated by additional evi-

vorable to him on his own initiative." *Id.* at 1345.

**304**

dence, may properly support injunctive relief. *See Dauman Pallet,* 823 F.Supp. at 252 n. 2.

In this case, however, we find insufficient additional evidence on which to conclude that Encor's actions in fact produced a chilling effect. First, approximately 30 to 35 people, or roughly half of Encor's employees, felt sufficiently secure to attend a Union meeting held shortly after Mahoney's termination in the presence of at least one supervisor. Rec. at I–25, 193, II–79. Not one of the employees in attendance suffered retaliation in any form. Rec. at I–27, 193. In addition, Dennis Valo—the one live witness of the several employees that Mahoney claims refused to join the Union out of fear—was not asked about and did not refer to feeling chilled by Mahoney's termination. *Cf. Zipp v. Caterpillar, Inc.,* 858 F.Supp. 794 (C.D.Ill.1994) (finding live testimony of several witnesses concerning chilling effect of employer's actions insufficient evidence that § 10(j) injunction was necessary to prevent irreparable harm).

■ In addition, the Board has not demonstrated that the public interest in peaceful labor negotiations would require the interim relief sought here (again, assuming *arguendo* Mahoney was unlawfully discharged). As noted *supra,* we must determine whether a § 10(j) injunction is needed to preserve the status quo, i.e. the "situation right before the alleged unfair labor practices took place," pending litigation. *Vibra Screw,* 904 F.2d at 878 and n. 5. At the time of his discharge, Mahoney was not an employee negotiator participating in an on-going bargaining process. In fact, he was not even designated to be part of the bargaining committee until after he was terminated. Rec. at I–156–58, II–40, 77. This fact alone distinguishes this case from the Third Circuit's decisions in *Vibra Screw* and *Wellington* on which Petitioner relies so heavily. In *Vibra Screw,* the employer fired four of the five employee members of the bargaining committee within three weeks of the first bargaining session. 904 F.2d at 878. In *Wellington Hall,* the employer discharged eight individuals, including five of the six members of the employee negotiating committee immediately before and after the first scheduled bargaining meeting. 651 F.2d at 905. Our Court of

Appeals reversed denials of interim reinstatements in both cases, finding a clear need in each to combat the unmistakable chilling effect of the employers' actions and to preserve the collective bargaining process pending the Board's adjudication. *Vibra Screw,* 904 F.2d at 878–881; *Wellington Hall,* 651 F.2d at 906–07.

Petitioner does not claim that reinstating Mahoney is required to bring Encor to the bargaining table. Indeed, Encor assumed this obligation, albeit reluctantly, by settling claims it might otherwise have fought tooth and nail, and has sat down to bargain several times since. *Cf. Id.* (granting injunction where record showed "history of employer resistance to bargaining"); *Konig,* 895 F.Supp. 688 (granting § 10(j) relief where employer engaged in delay tactics and refused to bargain). Rather, the Board claims that the Union will have "no strength" in the bargaining process without Mahoney's reinstatement. The ambivalent evidentiary support for this assertion aside, such a claim is not persuasive if the Union did not have this "strength" when Mahoney was discharged.

**CONCLUSION**

For the foregoing reasons, we conclude that there is no reasonable cause to believe that Encor unlawfully discharged Jerry Mahoney on March 18, 1996, and that, even if there were, ordering his reinstatement would not be just and proper relief under the circumstances presented here. Petitioner's motion for an injunction under § 10(j) of the NLRA is therefore denied. An appropriate Order follows.

**ORDER**

AND NOW, this 5th day of December, 1996, upon consideration of the Petition of Peter W. Hirsch, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, for Injunction Under § 10(j) of the National Labor Relations Act, as amended, Respondent Corban Corporations, Inc., d/b/a Encor Coatings, Inc.'s opposition thereto, the witnesses and exhibits presented by Petitioner and Respondent at the show cause hearing on October 10, 17, and

18, 1996, and all submissions of both parties, it is hereby ORDERED that the Petition is DENIED.